[Civ. No. 192. Fifth Dist. Apr. 22, 1963.]

CLYDE P. McGUIRE, Plaintiff and Appellant, v. W. A. THOMPSON DISTRIBUTING COMPANY et al., Defendants and Respondents.

J. Adrian Palmquist, Oscar F. Catalano and Francis T. Cornish for Plaintiff and Appellant.

Borton, Petrini, Conron, Brown & Condley and P. R. Borton for Defendants and Respondents.

CONLEY, P. J.—This is an appeal fom a judgment for the defendants in an action for personal injuries arising out of a collision of automotive vehicles. The sole ground of appeal is an alleged irregularity in the proceedings after the jury retired for their deliberations and returned into court with a request to hear certain testimony reread. Appellant claims that the trial judge failed to comply fully with the jury's expressed wish and that he compounded his mistake by telling the jurors that there was no evidence on the subject other than that which he ordered read. The respondents, on the contrary, contend that the trial judge complied fully and explicitly with the request of the jury. The appellant concedes that the record contains substantial evidence to support the verdict, and he does not suggest that the court erred in its instructions or in any ruling on the evidence.

A collision occurred on Friday evening, August 22, 1958, on Highway 178 in Kern River Canyon, about a mile above Ridge Bar Ranger Station on the road between Bakersfield and Kernville between a Dodge 2-ton beer truck driven by the respondent Paul Bates for his employer, W. A. Thompson Dis-

tributing Company, and a Ford pickup operated by the plaintiff, Clyde P. McGuire. The plaintiff sustained injuries to his head, back and left arm with the result that the amputation of the arm became necessary.

At the time of the collision the beer truck operated by Bates was traveling somewhat downhill in a westerly direction, and he was making a left-hand turn following the course of the highway, while the Ford pickup driven by McGuire was moving easterly uphill and making a right-hand turn; each of the vehicles was traveling at a speed of between 30 and 35 miles an hour. As the automobiles rounded the curve, Bates testified that he saw the McGuire vehicle when it was 40 to 45 feet away, and McGuire stated that he saw the Dodge truck when it was approximately 35 feet from him. As soon as he saw the other car Bates hit his brakes. The impact occurred on the turn. The Dodge truck stopped within 40 feet, but the McGuire pickup traveled 325 feet from the place of the collision on around the right-hand turn.

Each of the drivers testified that the collision happened on his own side of the center white line. Enlightening evidence addressed to this question was given by witnesses other than the parties. One, Lawrence Byrd, testified that, accompanied by his wife and children, he was preceding the McGuire vehicle up the grade at a distance of from 150 to 200 feet; he met and passed the beer truck, and it was then well over on its own side of the road; no difficulty was experienced by Byrd in meeting and passing the truck in the area where the "skip skids" (hereinafter referred to at length) were shown on plaintiff's exhibits. Within a second or two after he met and passed the beer truck, he heard the crash of the collision behind him. He had heard no tire squeals before the crash. Mrs. Byrd testified similarly. It is therefore clear that shortly before the collision the beer truck was on its own proper side of the white line. Further evidence confirmatory of the defendants' contention was given by Charles L. McMasters, of the California Highway Patrol, who was dispatched to the scene of the accident shortly after its occurrence; he found the beer truck halted on the roadway 40 feet from the point of impact and the Ford pickup 325 feet in an opposite direction from the point of impact; he noted dirt, debris, and a piece of chrome from the Ford pickup located in the westbound lane — on the Dodge truck driver's side of the white line. Mr. McMasters also saw solid dual tire marks some 15 feet in length; they were light in color, and, to use the witness'

expression, looked like "impending" skids. Mr. McMasters saw no other skid marks on the highway, although he walked the entire distance between the Dodge beer truck and the Ford pickup several times looking for tire marks. The only skid marks that he saw were solid, as above stated, and he observed no "skip skid" marks. The faint dual marks that he did see in the actual vicinity of the accident were approximately 24 inches to the west, or on the Bates side, of the center line; in his opinion they were made by the left-hand dual wheels of the beer truck. The point of impact, in his opinion, was 2 feet west of the center line in the westbound lane, that is to say, the proper lane for the Dodge beer truck.

On the day following the collision additional skid marks, which either were not present on the night of the accident or were not then observed, received attention from investigators; these newly noted marks were photographed on Sunday, August 24, two days following the accident, by Henry Jackson, an expert witness employed by the plaintiff. Numerous pictures were received in evidence as well as several plats drawn to scale by one Arthur H. Bell. Throughout the trial the marks discovered on the day after the accident were characterized as "skip skids," being broken in nature and located some 75 feet from the point of impact. Mr. Jackson testified that the "skip skid" marks showed a pattern similar to the tread on the Dodge truck's right rear dual wheels, but admitted that this was a common tread design for the type of truck involved. He also conceded that similar trucks with similar tire treads used this particular road, including hay trucks, grocery trucks and other types. Mr. Jackson saw no debris from the impact and no light tire or skid marks as found by Officer McMasters on the night of the accident, but he stated that he did not mean to intimate that the light skids seen by the California Highway Patrol officer in the westbound lane were not in fact present immediately following the collision; he said that he would expect debris of the impact to have been dissipated by the time he arrived at the scene. The inference which plaintiff's counsel obviously wished the jury to draw was that the "skip skids" were made on the night of the accident by the right dual tires of the truck driven by Mr. Bates and that because of its width the truck would necessarily infringe on Mr. McGuire's half of the highway.

These "skip skid" marks had been the subject of testimony by Paul Bates in the municipal court where McGuire was tried for driving on the wrong side of the highway and in a

deposition taken for the purpose of preparing for this trial, as well as at the trial itself. At the trial Bates was questioned at length as to the "skip skid" marks and his entire method of operating the beer truck prior to and at the time of the collision.

With this preliminary treatment of the factual basis of the case, we come to the sole ground of appeal, appellant's contention that the jury asked for the reading of certain testimony and that the court fatally erred by reading only a small portion of what the jury had asked for.

After the jury had retired and had conducted its deliberations for some time, it was returned into court at its own request for the reading of certain testimony which was described in a written question prepared by the foreman and delivered to the judge. The exact wording of the question is in doubt due to the fact that the trial judge through inadvertence neither read the question into the record nor preserved the paper on which it was written. The following proceeding took place according to the official transcript:

"The Court: Let the record show the presence of the jury and counsel. The foreman has asked that the jury hear again portions of the record in which the defendant Bates was questioned by plaintiff's counsel in regard to the identity of the right hand dual skip skids. Counsel and I and the court reporter have checked the record and we find but one reference to that in the actual reference irrespective that it may have been alluded to there — in their arguments. In reading to you the evidence in the case we can only take those things which were actually referred to in the court [*sic*] of the testimony. So, Mrs. Reporter, would you read the one portion that we have been able to find.

"The Reporter: (reading)

" 'Q. Now, those broken skid marks that are shown in that photograph and labeled "right dual tire marks" you saw those the following day after the accident there, didn't you, on the highway? A. Yes, sir.

" 'Q. When did you see them, in the morning? A. Yes, sir.

" 'Q. And did you get out and examine them? A. Yes, sir.

" 'Q. And that is when you determined they came from the right dual wheels of your tires? A. I presume they did.

" 'Q. That is when you determined they did, isn't that right? A. I presume they did. I didn't know for sure.'

"A Juror: This is what we've heard here. This is not from the deposition or from the Municipal Court trial?

"Another Juror: That was not in evidence is that the idea?

"The Court: No, we have taken from what was said here in court, anything that may have been read from either the deposition or the transcript of the proceedings in the Municipal Court. There may have been matters alluded to in the argument of counsel but we cannot find any place where they were actually spoken here in court or read from the transcript. This is the only reading or testimony that we find with respect to those rear duals.

"A Juror: Your Honor, was this here read from the Municipal Court proceedings?

"The Court: Page 51. And this was read by plaintiff's counsel in his cross examination of Mr. Bates, in effect, did you not say thus and so.

"A Juror: In the Municipal Court?

"The Court: No, in the deposition which was taken in October of 1958.

"A Juror: I thought they read something about this in the Municipal Court?

"The Court: Counsel read from it in his closing argument, sir, but we are unable to find in the record any place where counsel read from it during the course of the trial. And therefore unless it was read in the examination of the witness during the trial it would not be evidence.

"A Juror: I thought they read this in the early part of the trial.

"The Court: We have looked, all of the evidence of Mr. Bates has been transcribed earlier by the reporter. She has been through it. Counsel and I have been through our notes, and somehow we don't find it. We find merely this reference in the deposition which the reporter has just read to you.

"A Juror: That is fine.

"Another Juror: Thank you.

"The Court: All right. Thank you."

As the exact contents of the note in which the jury requested the reading of testimony is of prime importance, we quote the statement of the trial court at the opening of the proceedings on motion for a new trial:

"The Court: . . . This is the matter of McGuire against Thompson and others. The plaintiff's motion for new trial. I have read the briefs submitted by both parties. I think it

would be wise at the very outset if for the record I stated the problem as I see it. One of the problems perhaps. The jury went out for dinner and after their return from the evening meal the foreman sent me a note and I did something which I have not done before and do not propose ever to do again in the future, to wit, I neither read the note into the record nor did I preserve it physically. Mr. Borton was not in the courthouse at the time the request was made nor was Mr. Palmquist who had returned to his home. Mr. Borton was sent for and pending his arrival I went through my own notes and the court reporter was working through hers in the endeavor to get the information that the jury had requested. In substance the note asked for the — anything out of the deposition of Bates or out of the Municipal Transcript of the Municipal Court proceedings in the case of *People* versus *Bates,* which would relate to these skip skids which were an important factor in the case.

''Mr. Catalano did not have his trial notes in chambers with him at the time that this was going on. When Mr. Borton arrived I conveyed to him in substance the contents of the note or I may even have shown him the note. I don't recall. He went through his notes and I through mine trying to find the information that was requested. And between Mr. Borton's notes and my own and the court reporter's we were only able to find the material that had been read to the jury in the cross examination of Bates from his deposition, one spot relating to these skip skid marks. Mr. Catalano had read from a portion of the Municipal Court proceedings in his closing argument to the jury and we got into some discussion then as to whether it would be wise or not for me to order that portion of it read to the jury. Mr. Borton felt it would be unwise, and I was doubtful myself, and in substance Mr. Catalano said that he didn't want error in the case, therefore, not to refer to the matter which he'd used in closing argument.

''So then we came back into the courtroom and the proceedings as they are then reported are in the reply brief, but the jurors asked one or two questions as is noted in the brief, and then was [*sic*] asked if there was anything else, and in substance said no, that takes care of it, or that is fine, and went back to deliberate.

''I apologize to counsel for not preserving the note because it has just caused additional work and effort here, and it has caused some misunderstanding as to what happened. But I

take it from the notice of intention to move for new trial that that is not the only proposition which counsel for the plaintiff wished to raise. So with those comments on my part why I welcome argument in support for the motion.''

In resisting the motion for a new trial defendants introduced affidavits of P. R. Borton, one of the counsel for the defendants, and of Jules J. Deffes, Jr., foreman of the jury. Mr. Borton states that when he received word at his home that the jury desired more information, he went to the court-house; his affidavit continues:

''Upon his arrival, he entered chambers where he found Judge Gordon L. Howden, plaintiff's attorney, Oscar Catalano, and the court reporter, Adelene Remerowski, seated around the judge's desk. That on arrival Adelene Remerowski was searching through written reproduction of testimony of Paul Bates which she had written up during trial at the request of plaintiff's attorney. Affiant made inquiry of the Court as to what the request had been. The Court showed affiant a written note and read it in the presence of Affiant, representing the defendants, and Oscar Catalano, the attorney representing the plaintiff. That the note read in substance and effect as follows:

'' 'Would it be possible for the jury to hear the portions of the deposition and the Municipal Court proceedings dealing with the identity of the rear dual skip skid marks?'

''The Court advised affiant that prior to affiant's arrival discussion had indicated there were only two possible references which could be given in response to the jury's inquiry; one from the deposition of Paul Bates which had been located already by the reporter as in evidence, and the other, a portion of the Municipal Court proceedings read by plaintiff's attorney, Oscar Catalano, during argument, but as to which they were unable to find anywhere in the record of the evidence, as distinguished from argument, that the particular Municipal Court proceedings had been introduced.

''During this time the Court was examining its notes taken during the trial, the court reporter was not transcribing the proceedings in chambers, but was examining the written record previously prepared by her. No reference was ever found of the Municipal Court proceedings dealing with the identity of the skip skid marks in the evidence. At this point affiant informed the Court that the jury should have read to it all matters actually admitted in evidence and requested by them, but that matters not included in the evidence should not be

read to the jury. Oscar Catalano, the attorney representing the plaintiff, at this point stated to the Court words in substance and effect as follows: 'Do not read the Municipal Court proceedings.'

"No request was ever made by any attorney representing the plaintiff, or the plaintiff, either in chambers or when the jury reconvened, or at any other time during the subsequent deliberations of the jurors, that any other or additional matter be read to the jury than that which was actually read to the jury.

"At the time the jury reconvened the Court instructed the reporter to read to them the one portion of the deposition of Paul Bates theretofore agreed to be read in the proceedings in chambers. At the time of such reading, no objection was raised by the plaintiff, or any attorney representing the plaintiff, and no request that additional or supplemental matters be read to the jury was ever made by the plaintiff, or any attorney representing the plaintiff. The first intimation that there was any claimed objection to the conduct of the Court in response to the jury's request for additional information occurred subsequent to the verdict rendition and discharge of the jury in plaintiff's Memorandum In Support of Motion For New Trial made in excess of ten days after the discharge of the said jury."

The affidavit of the jury foreman deals with the contents of the written request: "During the course of our deliberations I wrote a note to Judge Howden requesting the reading of certain testimony given by Paul Bates. As nearly as I recall the contents of the note requesting this information read as follows: 'Would it be possible for us to hear the deposition and municipal proceedings wherein Bates was questioned regarding the identification of the skip-skid marks?' Nothing else was requested on this note."

In support of the motion for new trial the plaintiff offered the affidavit of Oscar F. Catalano, one of the counsel for plaintiff, which stated that his associate, Mr. J. Adrian Palmquist, tried the entire lawsuit for the plaintiff except for the direct examinatioon of Clyde P. McGuire and the making of the concluding argument on behalf of the plaintiff, which were conducted by affiant. He continues:

"During my concluding argument, I read Page 16 of the Municipal Court transcript inadvertently. It was determined that this did not get into the trial record, and, therefore, I told Judge Howden and Mr. Borton that Judge How-

den should not read to the jury the excerpts of Page 16 that I read to the jury.

"I did not see the note passed by the Jury Foreman to Judge Howden, and was not handed the note by Judge Howden.

"While in chambers, I did not have my notes or the typewritten transcript of Bates' testimony at any time during the proceedings.

"I had previously checked the trial transcript before going into chambers for the excerpts of Page 16 of the Municipal Court transcript which did not get into evidence, and nothing else. I did this hurriedly, as time was pressing. The chambers session took about ten to fifteen minutes.

"Adelene Remerowski, Court Reporter, was asked by the Judge to find evidence in the trial record of the right wheel dual skids of the beer truck. She checked her original trial stenographic notes, and not the typewritten transcript of Bates' testimony, and told Judge Howden that she only found one reference to the right wheel duals. I completely relied upon the stenographic notes of the Court Reporter and upon Judge Howden's assertion that there was no other reference to right wheel duals in the trial record."

The motion for new trial was denied by the court.

As already stated, the appellant contends that the jury asked for any evidence on the part of the defendant Bates which referred in any way to the "skip skid" marks, while respondents contend that the request was strictly limited to the record with respect to evidence of Bates given at the municipal court hearing or in his deposition relative thereto. In appellant's opening brief some 23 printed pages of excerpts from the record are set forth as testimony which he contends should have been read to the jury.

Section 614 of the Code of Civil Procedure provides that if there is a disagreement among jurors during their deliberations as to any part of the testimony which they have heard they may return into court and secure from the court in the presence of counsel for all parties the desired information as to the record. (*Halada* v. *Venice Lake Park, Inc.*, 132 Cal.App.2d 788 [283 P.2d 42].) ▮ If they ask for testimony relating to a specified subject, they are entitled to hear all of it. (*People* v. *Henderson*, 4 Cal.2d 188, 194 [48 P.2d 17]; *Davis* v. *Erickson*, 53 Cal.2d 860, 864 [3 Cal. Rptr. 567, 350 P.2d 535].) However, it is equally clear that the trial judge does not have to order read any part of the rec-

ord which is not thus requested by the jury foreman. (*People* v. *Cathey*, 186 Cal.App.2d 217, 221 [9 Cal. Rptr. 694]; *People* v. *Smith*, 3 Cal.App. 62, 68 [84 P. 449].)

The additional portions of the record which appellant maintains should have been read to the jury appear upon examination and analysis to be relevant and material only if the request made by the jury was as broad as appellant now claims. The parts of the record referred to may be thus numbered for convenience in covering the subject as they appear in appellant's opening brief:

| No. 1 | Pages 5- 9 |
|-------|-----------|
| No. 2 | Page 9 |
| No. 3 | Pages 9-10 |
| No. 4 | Pages 10-12 |
| No. 5 | Pages 12-13 |
| No. 6 | Pages 13-15 |
| No. 7 | Pages 15-17 |
| No. 8 | Pages 17-18 |
| No. 9 | Pages 18-21 |
| No. 10 | Pages 21-22 |
| No. 11 | Pages 22-24 |
| No. 12 | Pages 24-25 |
| No. 13 | Page 26 |
| No. 14 | Pages 26-28 |

In Nos. 1, 2, 3, 4, 5, 7, 8, 10, and 13 there is no reference to any questions or answers of Paul Bates taken either from the deposition or the municipal court proceeding. These contentions of appellant must therefore be eliminated as not contained within the jury's request, if limited as claimed by respondents.

In Nos. 6, 9, 11, 12 and 14 there are questions and answers taken from the deposition or the municipal court proceeding. None of them, however, deals with the identity of the "skip skid" marks. To be specific, in No. 6 where the reference is to the deposition it relates only to the fact that the truck had dual tires and some were smoother than others; in No. 9 questions from the municipal court record deal with the same subject matter—whether or not the truck was bumping; there is no reference to any "skip skid" marks. In No. 11 questions from the deposition are set out dealing with solid marks made by the left duals as seen by witnesses McMasters and Bates on the night of the accident, and no reference is made to "skip skids"; the municipal court transcript is also referred to dealing with the solid marks present on the night of the accident and not with "skip skids." In No. 12 the municipal

court proceeding is referred to; the quotation therefrom, appearing on page 25, deals only with where the point of impact was, not with "skip skid" marks. In No. 14 where the municipal court transcript is referred to the testimony deals only with solid marks of the left duals, not "skip skids."

Appellant has not referred this court to anything in addition to what was actually read in the entire transcript falling within the request of the jury, if the judge's understanding of the limitations on the request of the jury was correct.

The court's remarks at the opening of the proceedings on motion for a new trial, Mr. Borton's affidavit and the affidavit of Mr. Deffes clearly establish in our view that the question directed by the jury to the court was restricted in scope, that the trial judge complied fully with the request made by the jury and that there was therefore no error.

The appellant contends that the Deffes affidavit should not have been received in evidence and considered by the court on the ground that it constitutes a forbidden attempt to impeach the jury's verdict. (*Sopp* v. *Smith,* 59 Cal.2d 12 [27 Cal. Rptr. 593, 377 P.2d 649].) However, this is scarcely an impeachment of the verdict. It is an affidavit as to what occurred in open court; it does not cover any privileged proceedings occurring in the jury room. It deals with the contents of a note which was handed by the foreman to the bailiff and by him to the court and which constituted the explicit question directed by the jury to the judge and which was answered by the judge. The affidavit in question, furthermore, did not constitute any impeachment of the verdict or of the record but in fact supports it.

Furthermore, we do not believe that an experienced attorney would sit by without making any protest or taking any exception if a superior court judge in answering a question by the jury would say that he could only find one portion of the testimony that complied with their request for the reading of evidence, but overlooked additional pertinent portions of the record extensive enough to fill 23 printed pages. Mr. Catalano, by his own affidavit, was present during the whole trial, examined one witness, made the concluding argument to the jury and equally with the court and opposing counsel had available for consultation the official court reporter's notes and the transcript of the testimony of Mr. Bates. He sat silent except to request that an error made by him during argument should not be repeated by again reading a portion of the municipal court transcript which had not been received in

evidence. The trial court could well have concluded that counsel for appellant agreed with his statement at the time it was made to the jury. ▪ No principle of law is better settled than the rule that a litigant cannot sit quietly by and chance a favorable verdict and thereafter assert error when he has helped to create the error or nurtured it by his silence.

"We think that if counsel for defendants was dissatisfied with the statements to the jury it was his duty to say so at the time, and thus give the court an opportunity to cure any defective or incomplete statement; . . . Under such circumstances appellants are precluded from raising their objections on appeal only, and then as an apparent afterthought. As was said in *Aydlott* v. *Key System Transit Co.,* 104 Cal. App. 621, 628 [286 P. 456], 'A party should not be permitted to remain quiet and take the chance of a favorable verdict, and then, if the verdict is unfavorable, raise the objection on appeal.' " (*Downing* v. *Silberstein,* 89 Cal.App.2d 838, 844-845 [202 P.2d 91.) (See also *Kumelauskas* v. *Cozzi,* 191 Cal. App.2d 572, 576 [12 Cal. Rptr. 843] ; *People* v. *Jones,* 191 Cal.App.2d 478, 483 [12 Cal.Rptr. 777].)

The judgment is affirmed.

Brown (R.M.), J., and Stone, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 19, 1963.