[Crim. No. 3679. Second Dist., Div. One. May 27, 1943.]

THE PEOPLE, Respondent, v. MARY W. TOLMACHOFF, Appellant.

Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, R. S. McLaughlin, Deputy Attorney General, Fred N. Houser, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

WHITE, J.—The defendant was charged in an information filed by the District Attorney of Los Angeles County with the crime of perjury and subsequently was tried on said information in the superior court of said county. At such trial the jury found her guilty. Thereafter, defendant made a motion for a new trial which was denied. Thereupon further proceedings were suspended, no judgment was pronounced, and defendant was placed on probation for the term of five years on condition that she serve three months in the county jail. Defendant appeals from the order denying her a new trial.

The information herein charges that the alleged perjury was committed by the defendant as a witness in a criminal action tried in the Superior Court in Los Angeles County and in which one Nick Homotoff and Cecil H. Salter were accused of the crime of kidnapping for the purpose of robbery, in violation of section 209 of the Penal Code.

It appears that on July 23, 1941, Wesley Sherman was employed as a bookkeeper for Motor Discount Company in Los Angeles and resided at 380 Dearborn Street in the city of Pasadena. On said date one Arthur Taube, driving an automobile and accompanied by the aforesaid Nick Homotoff and Cecil Salter, followed Mr. Sherman as the latter drove away from his Los Angeles office to his Pasadena home at which place he arrived about 8:30 o'clock in the evening. Mr. Sherman drove into his driveway while Taube parked the automobile he was driving a short way from Sherman's house where Salter and Homotoff left the automobile and went to the garage at the rear of the Sherman residence. Within a few minutes Homotoff returned to the automobile and Taube got out and accompanied Homotoff back to the garage where he observed Mr. and Mrs. Sherman and the latter's mother, Mrs. Whitehouse. On this occasion Taube, Salter and Homotoff were

armed with deadly weapons. The evidence indicates that on the evening in question Mrs. Sherman, who was at home, retired about 8:30 and shortly after her husband came into the house accompanied by Cecil Salter, who had a gun, and Salter compelled her to get out of bed and deliver to him what money she had, amounting to $1.85. Thereupon Salter at the point of a gun ordered Mr. and Mrs. Sherman to go outside the house where Mrs. Sherman's mother was seated in an automobile with another man, the latter of whom had her covered with a gun. Salter asked Mr. Sherman for the combination of the finance company's safe and Mr. Sherman pleaded ignorance thereof but Mrs. Sherman volunteered the statement that she knew who could open the safe and that if the robbers would leave her mother at home with Mrs. Sherman's 14-year-old boy who was ill, she would take them to the home of Mr. Ide, owner of the finance company, who lived in San Marino. Thereupon the mother, Mrs. Whitehouse, was taken into the house by Homotoff who was armed with a gun. At the direction of Salter, Mr. and Mrs. Sherman entered the automobile and were driven to Mr. Ide's home. At that point Salter ordered Mr. Sherman out of the car and the two went to the front door of Mr. Ide's home, with Salter hiding in the bushes. It appears that Mr. Ide was not at home but was visiting at the residence of a Mr. Parker, to which place the Shermans accompanied by Salter and Taube drove, and when they arrived at the Parker home, Salter again hid in some bushes while Sherman, at the former's direction, went to the door and asked for Mr. Ide, the latter of whom appeared but suddenly turned back into the house and closed the door. At this juncture Salter dashed for the automobile and drove away accompanied by Taube and Mrs. Sherman. Near Fair Oaks Avenue in Pasadena the automobile was stopped and Salter directed Taube to telephone to the Sherman home and advise Homotoff to depart therefrom. Later, at about 10:45 o'clock that night, Mrs. Sherman was put out of the car in a vacant lot after Salter had taken her diamond ring.

There was positive testimony given by Mrs. Whitehouse that from about 8:45 p.m., until 9:45 she was held captive by Nick Homotoff in the kitchen of her daughter's home. She positively identified him and further testified that about 9:45 the telephone rang, Homotoff answered it, after which he tore the instrument from the wall and ran out of the house. At

the trial wherein Homotoff and Salter were charged with kidnapping Mrs. Whitehouse for the purpose of robbery, Taube testified on behalf of the prosecution and his evidence established the fact that Homotoff was one of the participants in the outrage perpetrated upon Mr. and Mrs. Sherman and the latter's mother. At the same trial, the defendant in the instant case testified as a witness for the defendant Homotoff. She testified that she had known Homotoff since the first day of 1941; that she was engaged to be married to him, that on the night of July 23, 1941, defendant Homotoff was with her from about 7:30 or 8 o'clock until some time between 11:30 and midnight. She testified that Homotoff accompanied her to a performance at the Mayan Theatre in the city of Los Angeles; that it was the first time she had ever been to a theatre and that she saved the program, which she produced at Homotoff's trial and which was offered in evidence. A review of the record in this case discloses that the defendant herein positively, unequivocally and without reservation testified that Homotoff was with her, going to and from her home and at the theatre, at all times between approximately 7:30 or 8 o'clock and midnight.

At the trial of defendant herein for perjury, a police officer testified that on the morning of May 14, 1942, defendant herein requested an interview with him at which she said ''Well, now that it has been proved that Nick and I was not to the show on the 23rd of July, I will say I guess I was not there.'' The officer asked defendant if she would put her statement in writing to which she consented, writing in part ''I thought I'd help him in some way. So that's why I came to court and brought the programs. . . . I have a feeling in my heart that Nick was not involved in that case. So that's why I testified to help him. . . . ''

At defendant's trial on the perjury charge, Mary Lacey, secretary to the publisher of the program at the theatre which defendant testified she and Homotoff attended, gave testimony that the program, identified by defendant herein at Homotoff's trial and offered in evidence in the latter's behalf, was not published in July but about August 27, 1941.

Appellant first insists that the judgment should be reversed because of the insufficiency of the evidence to sustain the guilty verdict. In support of this claim we are reminded that defendant's testimony was given with reference to events

that occurred some ten months prior to the time she testified thereto and that her testimony reflects her best recollection, honestly given, as to what occurred nearly a year prior to the time when she testified. While it is true that upon cross-examination at the trial where she testified in behalf of Homotoff, the defendant herein used such terms as "I am pretty sure"; "I am pretty sure it is that date"; nevertheless she at no time receded from the claimed verity of her positive testimony given on direct examination that Homotoff could not have participated in the crime charged against him in the city of Pasadena on the evening of July 23, 1941, because he was with the defendant herein attending a Los Angeles theatre. This is evidenced by the following questions and answers thereto occurring during her cross-examination at Homotoff's trial:

"Q: How long before you went to the theatre?

"A: Well, we went on July 23rd, and we quarrelled on the Thursday before.

"Q: What I am trying to figure out is how you know you went to the theatre on July 23rd?

"A: Well, by my birthday."

Furthermore, she testified that she saved the program which she received at the theatre on the occasion which she testified marked the first time in her life she had attended a theatrical performance. A review of the testimony given by the defendant herein at the trial of Homotoff satisfies us that her positive declarations as to Homotoff's whereabouts on the evening in question were not based upon any belief in the truth thereof but rather were actuated by the belief upon her part, expressed in her signed statement made to the police, wherein among other things she said "I have a feeling in my heart that Nick (Homotoff) was not involved in the case. So that's why I testified to help him." The use of the word "wilfully" in a prosecution for perjury simply means that the witness made the allegedly perjurious statement with the consciousness that it was false; with the consciousness that he did not know that it was true and with the intent that it should be received as a statement of what was true in fact. (*People* v. *Okomoto,* 26 Cal.App. 568, 570 [147 P. 598]; *People* v. *Johnson,* 14 Cal. App.2d 373, 379 [58 P.2d 211].) The state of the record before us clearly justified the jury in finding that the defendant herein testified falsely; with a bad purpose and therefore "wilfully" as that term is used in the statute. (Sec. 118, Pen.

Code.) Furthermore, an unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false. (Sec. 125, Pen. Code.)

Appellant next insists that the evidence does not measure up to the requirement of the law that perjury must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances. (Sec. 1103a, Pen. Code.) This claim is without merit. The witness Taube testified that Homotoff rode with him in the automobile to the Sherman residence and went into the house with Mrs. Whitehouse where he remained on the evening of July 23, 1941, until about 9:45 p.m., when he was advised through a telephone call to leave. Mrs. Whitehouse testified that Homotoff held her captive in the house from about 8:45 to 9:45 o'clock on the evening in question. Appellant contends that the testimony of these two witnesses, combined, only equals the testimony of one witness. With this we do not agree. Section 1839 of the Code of Civil Procedure defines corroborative evidence as additional evidence of a different character, to the same point. If Taube had testified that Homotoff was in the house with Mrs. Whitehouse at the time the latter testified he was, then Taube's testimony might be said to be cumulative as distinguished from corroborative, but such is not the case and Taube's evidence was given as to where Homotoff was prior to his entry into the house with Mrs. Whitehouse. His testimony was therefore of a different character but to the same point as that of Mrs. Whitehouse, viz., that Homotoff was not at a Los Angeles theatre with defendant herein, as testified to by her, and that her testimony in that regard was therefore false. The cases of *People* v. *Burcham,* 62 Cal.App. 649 [217 P. 558], and *People* v. *Layman,* 117 Cal. App. 476 [4 P.2d 244], cited and relied upon by appellant are not therefore applicable to the facts here present. Even though it be conceded that the composite testimony of Taube and Mrs. Whitehouse must be regarded as the equivalent only of the testimony of one witness, there remains the corroborative testimony of Mary Lacey that the company by which she was employed printed the programs for the Mayan Theatre in Los Angeles and that the program that defendant testified she received at the theatre in Los Angeles on the evening of July 23, 1941, was not printed until after August 27, 1941. The *quantum* of evidence and corroborating circumstances shown herein must therefore be held to meet adequately the requirements of

section 1103a of the Penal Code. (*People* v. *Follette*, 74 Cal. App. 178, 204 [240 P. 502].)

██ It is next contended by appellant that the court committed prejudicial error by admitting into evidence the testimony of the witnesses Taube and Mrs. Sherman as to the events which transpired after these witnesses, with Mr. Salter and Mr. Sherman left the latter's home at which place Homotoff remained with Mrs. Whitehouse, with the possible exception, concedes appellant, of Taube's telephone conversation with Homotoff about 9:45 o'clock as hereinbefore narrated. By an appropriate instruction the court admonished the jury that such evidence was not received for the purpose of proving that the defendant herein had knowledge of, committed, or participated in the robbery and kidnapping offenses referred to in such testimony, but solely for the purpose of enabling the jury to determine whether the testimony given by defendant herein at the trial of Homotoff was true or false, and secondly, for the purpose of enabling the court to determine whether such testimony given by defendant herein at Homotoff's trial was in fact material to the issues presented in that case, and for no other purpose. We are unable to perceive how defendant herein was prejudiced by this testimony. It was not admitted to show that she was in any way concerned in the commission of the crimes to which such testimony related, and the jury was so instructed. The challenged testimony was offered only for the twofold purpose indicated. The evidence in question tended to corroborate the testimony of Mrs. Whitehouse that Homotoff was at the Sherman residence with her from the time Taube, Salter, Mr. and Mrs. Sherman left to seek Mr. Ide and until Taube telephoned Homotoff to depart from the Sherman residence. In that connection it was admissible as an aid to the court in determining the materiality of appellant's testimony at Homotoff's trial and for the further purpose of showing that appellant testified falsely when she swore that Homotoff was with her at that time in a theatre located in the city of Los Angeles. We find nothing in the questioned testimony even intimating the participation by appellant in the depredations that Taube and Salter committed, and consequently appellant was not prejudicially affected thereby.

██ Next appellant insists that the trial court fell into error in the giving of and refusal to give certain instructions.

Complaint is made of the refusal of the court to define for the jury certain words used by the appellant in her testimony at her trial for perjury. She requested that the court give to the jury a definition of the words "recollection" and "recall." The action of the court in refusing such instructions was proper for the reasons given by us in our discussion heretofore of the positive testimony she gave at Homotoff's trial concerning his presence with her at a theatre in Los Angeles, and also because the words needed no definition. They are simple words, commonly used and as commonly understood. They have acquired no peculiar or special meaning in law apart from their commonly accepted and understood meaning established by universal usage and custom. Furthermore, what appellant may have "recalled" or "recollected" upon her trial for perjury had no bearing upon the positiveness and directness of the testimony given by her at the trial of Homotoff. Also, for reasons heretofore given, the action of the court in refusing to instruct the jury to the effect that the testimony of Mrs. Whitehouse and Arthur Taube related to the same matter and must be regarded as the testimony of one witness, must be held to be proper. The court correctly instructed the jury that in order to convict appellant of perjury the testimony of two witnesses, or one witness and corroborating circumstances, was required. The jury was advised that a defendant is presumed to be innocent, the doctrine of reasonable doubt was defined as well as the degree of proof required to satisfy the reason and judgment of those bound to act conscientiously upon the evidence in determining the guilt or innocence of the defendant. Perjury was defined as set forth in section 118 of the Penal Code; an instruction was given that in every crime there must exist a union or joint operation of act and intent; that no statement made by a witness constitutes perjury unless such statement is false and untrue and wilfully made with intent and design to deceive and mislead; that it is immaterial whether or not the statement actually does in fact deceive, but only whether it was testified to wilfully and with deliberate design and intention to deceive and with knowledge that it was in fact false at the time the testimony was given. The jury was further admonished that criminal intent is a vital element in the crime of perjury and if such intent be not proved the defendant is entitled to an acquittal; that if the defendant acted with no guilty intent, or the jury had a reasonable doubt as to such intent, she should

be acquitted; that the defendant could not be guilty of perjury if she swore honestly to what she believed to be true, even though she was mistaken. Another instruction advised the jury that if the evidence was susceptible to two constructions, each of which appeared reasonable, one pointing to guilt and the other to innocence, the jury must adopt the latter. The court also instructed the jury that they must be satisfied beyond a reasonable doubt that the defendant swore falsely at Homotoff's trial and that she knew her testimony was false and that unless the jury was so satisfied the defendant was entitled to a verdict of not guilty. The court also instructed the jury that evidence of the defendant's good reputation may be sufficient to create a reasonable doubt in their minds as to her guilt and that if such evidence produced such doubt the jury should acquit her. █ Appellant's complaint as to the refusal of the court to give certain proffered instructions concerning the element of criminal intent as applied to the crime of perjury and various other requested instructions is aptly answered by the language this court used in the case of *People v. Curtis,* 36 Cal.App.2d 306 [98 P.2d 228], at page 322, wherein we said "Appellant challenges the correctness of several other instructions, but when we remember that instructions should not be considered singly, but in their entirety (*People* v. *Macken,* 32 Cal.App.2d 31 [89 P.2d 173]), we have no hesitancy in saying, from a reading of all the instructions, that the jury was clearly, understandingly and unerringly admonished, and must have understood, that before they could find the defendant guilty they must be convinced beyond a reasonable doubt that he knowingly, wilfully, and in violation of his oath testified falsely as to certain matters material to the grand jury's inquisition; that they must base such conviction upon the testimony of two witnesses or of one witness and corroborating circumstances; and must be convinced beyond a reasonable doubt that at the time of the giving of such testimony he knew the same to be false and that he gave such testimony wilfully and for the purpose and with the intent of deceiving and misleading the grand jury. A reading of all the instructions given impresses us that the trial judge fully and fairly advised the jury as to the kind, quality and degree of proof necessary before appellant could be convicted of perjury. This is all the law requires."

█ Finally, appellant urges that the court erred in ad-

mitting into evidence the programs received in evidence at the trial of Homotoff. The basis for this contention is that no proper foundation was laid and that such evidence was incompetent, irrelevant, immaterial and hearsay. Nowhere in the record of the trial of appellant for perjury do we find any specifications of the reasons for the objections made to the introduction of the programs in evidence, and for the first time, on appeal, she attempts to show that these exhibits should not have been received in evidence. Without doubt, as the record discloses, appellant herself offered certain programs in evidence at the trial of Homotoff and that at her trial for perjury it was stipulated that these programs might be received in evidence. █ Where an objection to evidence is made, as was the case here, in general terms, and where the objection could have been cured by the party offering the testimony if the reason for which it was objected to had been given in the trial court, it is the general rule that an appellate tribunal will not consider such objections to the admission of evidence when the precise ground of objection was not clearly or at all specified in the trial court. █ Where, as here, the proffered evidence is allegedly imperfect because of the lack of preliminary proof, which might or might not have been supplied by the party offering such evidence, the objection must be specific and it must point out the alleged defect. If this is not done, the objection cannot be urged on appeal. (*People* v. *Owens,* 123 Cal. 482, 490 [56 P. 251] ; *People* v. *Wright,* 26 Cal.App.2d 197, 207 [79 P.2d 102] ; 8 Cal.Jur. pp. 503, 504.) █ Manifestly the programs offered in evidence by the appellant herself at the trial of Homotoff were admissible in evidence at her trial to prove that at the Homotoff trial she testified wilfully and falsely to a matter material to the issues framed and as presented at such trial.

For the foregoing reasons the order denying defendant's motion for a new trial is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied June 11, 1943, and appellant's petition for a hearing by the Supreme Court was denied June 24, 1943.