[Civ. No. 674. Fifth Dist. Mar. 30, 1967.]

GERTRUDE BARON, as Administratrix, etc., Plaintiff and Respondent, v. SANGER MOTOR SALES et al., Defendants and Appellants.

F. John Kann and Richard W. Nichols for Plaintiff and Respondent.

Stammer, McKnight, Barnum, Bailey & Barnett, Dean A. Bailey, McCormick, Barstow, Sheppard, Coyle & Best and Robert E. Coyle for Defendants and Appellants.

GARGANO, J.—This action was brought by Ruth Robinson, now deceased, to recover damages for injuries resulting from a three-automobile collision which occurred at approximately 1 a.m. on March 7, 1963. The action was tried before a jury which rendered its verdict against the plaintiff (respondent herein) and in favor of both defendants (appellants herein). Plaintiff then moved for a new trial upon three grounds: (1) Error by the court in admitting testimony concerning the custom and practice followed in the shop of Sanger Motor Sales when painting automobiles; (2) newly discovered evidence; and (3) insufficiency of the evidence to justify the verdict. The trial court granted plaintiff's motion on the first two grounds but denied it on the third, holding that there was sufficient evidence to justify the verdict in favor of both defendants. The defendants appealed from the trial court's order granting a new trial.

The pertinent facts, when viewed in the light most favorable to the respondent, are as follows. The decedent, Ruth Robinson, and a girl friend asked George Napier to drive them in his pickup truck from Huron to Avenal to attend a dance. Before leaving Napier warned the two women that he did not believe that he had sufficient gasoline to make the trip, but apparently they were willing to take the chance. As

Napier had expected, they ran out of gas on the way to Avenal while traveling on Lassen Avenue, a two-lane highway in rural southwestern Fresno County. Lassen Avenue runs north and south and is the principal route between the towns of Avenal and Huron, and the main traveled road in the entire area.

On this occasion they were assisted by some passing sailors who permitted Napier to siphon a small quantity of gasoline out of their automobile into the Napier pickup truck. Napier then turned around and started back toward Huron, but he ran out of gas a second time. Consequently, Napier guided the pickup truck off the road and parked it completely on the dirt shoulder with its wheels approximately four feet from the pavement. All three occupants of the vehicle had been drinking beer during these events.

Napier walked to a nearby farm labor camp to solicit the help of a friend, Clovis Lee Dowdy. Dowdy then drove Napier back to the parked pickup truck in Dowdy's Buick automobile, and the two men were trying to siphon gasoline from this automobile into the pickup truck when the accident occurred. The pickup truck was still located on the shoulder of the road facing north. Dowdy's Buick was parked parallel to the pickup truck, facing south toward the northbound lanes (so that the siphon hose would reach from one gasoline tank to the other), and was either partially on or entirely on the pavement of the highway with its lights turned on.

The appellant Neal, who had been drinking, was driving a Chevrolet station wagon northbound on the same road. Neal, believing either that a car was approaching toward him on the wrong side of the road or misjudging the situation by concluding that he could pass safely from the left, started to the left and collided with the parked vehicles. The collision was a violent one, resulting in the death of Neal's brother (who was a passenger in the Neal vehicle), very serious injuries to Ruth Robinson from which she died, severe injuries to Ruth's girl friend, and injuries to Napier and Neal.

Neal had purchased the Chevrolet station wagon which he was driving from appellant Sanger Motor Sales. This appellant had in turn purchased the vehicle from a Mr. Paul Carson. Carson had used the station wagon on a long distance journey, during which he had carried a heavy load. The effect of the heavy load was to weigh the car down in the back and to lift the car in the front, thus causing the lights to be

improperly directed. Realizing this problem, Carson had adjusted the lights so that they would shine properly with the heavy load on the automobile. However, this adjustment had not been altered by Carson when he sold the car to Sanger Motor Sales, and much of the conflict during the trial concerned whether Sanger Motor Sales had readjusted the lights on the vehicle before it was sold to appellant Neal.

I

The first question presented in this appeal is whether the trial court abused its discretion in granting a new trial because of the error it allegedly committed when it admitted into evidence the testimony of the witness Cecil King pertaining to the custom and practice of appellant Sanger Motor Sales to adjust headlights when it repainted used automobiles prior to resale. In this connection the evidence showed that after Carson traded the Chevrolet station wagon to Sanger Motor Sales it was serviced in its shop and, among other things, it was completely repainted. The work orders introduced into evidence by respondent Robinson, however, did not indicate that the lights had been adjusted. Thus, appellant Sanger Motor Sales called Cecil King to testify on its behalf. King, who was no longer an employee of this appellant at the time of the trial (he had been its assistant sales manager and later its sales manager), testified that he remembered the vehicle because it was an unusual model, a 9-passenger station wagon with a luggage rack, and because he recalled hearing of the accident involving the automobile only a day or two after it had been sold. He further testified that he had driven the automobile during the night time on at least two occasions after it had left the shop, and that on these occasions the beams from the headlights were shining ahead at least one hundred feet on low beam. In answer to a hypothetical question, he also testified that it was the custom and practice of appellant Sanger Motor Sales to readjust the headlights of all automobiles which were completely repainted. Specifically, King testified that he was familiar with the automobile painting practices and procedures which were in effect at Sanger Motor Sales when the Chevrolet station wagon was painted; that it was the common practice for the painters to do minor repair work and adjustment as part of the paint job without recording the work on the work sheet; that the painter doing a complete paint job on an automobile of the make and model of the Chevrolet station wagon would remove the headlights

and accompanying trim before painting so as to make it look like a factory job; and that after painting the car the painter would reinstall the headlights and then readjust or reset them, using for this purpose certain lines and markings on the floor and the wall of the paint shop.

The testimony of Cecil King was admitted by the court over respondent's objections that the question called for the witness's conclusion and that there was "no foundation." The record indicates that the following transpired:

"Q. MR. BAILEY: I want you, first, to assume that the former owner of the car had lowered the headlights. A. Yes.

"Q. Are you familiar with the process by which this is done? A. Right. Definitely so.

"Q. I want you to assume that he had lowered the headlights so low that even on high beam they only shone out 60 or 70 feet. I want you further to assume that after he did this he traded the car in to Sanger Motor Sales. The car was taken in to the paint shop. It was given the repairs that you have indicated here, including a complete paint job.

"I want you then to assume that after you drove the car or after it came out of the shop that the headlights shone down the highway the way you have described.

"A. Yes. I understand you.

"MR. PECKINPAH: Objected to on the grounds of calling for an opinion and conclusion. Maybe the objection is premature.

"THE COURT: Go ahead.

"Q. MR. BAILEY: Now, my question is: Can you explain to the ladies and gentlemen on the jury—

"A. Yes, I'll be glad to.

"Q. —how such a change took place?

"A. Sure.

"THE COURT: The objection will come in now and it's overruled. Go ahead.

"Q. MR. BAILEY: All right. Will you go ahead and explain it?

"A. Surely. When a car is taken in for a paint job—

"MR. PECKINPAH: The further objection of no sufficient foundation. I'd like that in the record also, Your Honor.

"THE COURT: All right. Overruled."

It is self-evident that the question "can you explain to the ladies and gentlemen of the Jury—how such a change took place?" not only called for his conclusion but also assumed

the truth of a fact to be established by the evidence. However, it is also clear that the impropriety of the manner in which the question was phrased was cured by the witness's answer. That is, by his answer, the witness simply explained the business practice of the appellant Sanger Motor Sales to adjust headlights when it repainted automobiles. Thus, the real question presented, and the only one raised by respondent in her motion for a new trial and in this appeal, is whether the court erred in admitting evidence of appellant's business practice in order to prove that the headlights of the station wagon had been readjusted when the car was sold to the appellant.

In support of her motion for a new trial, respondent contended that the testimony of Cecil King was improperly admitted because "evidence of a person's habit is not competent to establish a condition to which there are eyewitnesses." Hence, she successfully argued that since there was no showing at the time of trial that the persons who did the actual painting of the station wagon were either unknown or unavailable to Sanger Motor Sales, her objection going to the lack of a foundation should have been sustained. In other words, respondent contends that it cannot be said that at the time the disputed testimony was offered there were no eyewitnesses to the acts in question, and this lack of showing is in fact a failure to establish a foundation for the type of evidence which appellant sought to introduce.

We do not agree with respondent's contention that Cecil King's testimony was improperly admitted under the decisional law of this state which prevailed at the time of the trial. Admittedly, prior to the adoption of the new Evidence Code, the admissibility of habit evidence had been a troublesome question.[1] Moreover, the decisional law reveals considerable confusion as to when such evidence is admissible. The confusion, however, appears to be primarily in those cases dealing with evidence of a personal habit of an individual to prove "due care" or "lack of due care" on a particular occasion, and probably arises from the failure to distinguish

[1] The "no eyewitness" requirement has been abandoned by section 1105 of the new Evid. Code. As the comment states: "Eyewitnesses frequently are mistaken, and some are dishonest. The trier of the fact should be entitled to weigh the habit evidence against the eyewitness testimony as well as all of the other evidence in the case."

However, under section 12 we are required to decide this case under the decisional law in effect at the time of the trial. Significantly, when a new trial is granted the trial is conducted under the new Evid. Code (see § 12 of the Evid. Code).

between character for carefulness or carelessness and the habit or custom of doing some particular thing in a particular way (Witkin, Cal. Evidence (1st ed 1958) § 133, pp. 156, 157; McCormick on Evidence, § 162, p. 340). Thus, in this line of cases habit evidence has been excluded where there were eyewitnesses to the accident. And even here, it has been stated that the often cited leading California Supreme Court decision of *Starr* v. *Los Angeles Ry. Corp.*, 187 Cal. 270 [201 P. 599], decided in 1921, did not actually overrule the dictum of *Wallis* v. *Southern Pacific R. Co.*, 184 Cal. 662 [195 P. 408, 15 A.L.R. 117], decided just a few months earlier. (1 So. Cal.L.Rev., p. 285.) In *Wallis*, the Supreme Court had recognized the difference between evidence relating to general character for carelessness and evidence of the custom or habit of doing some particular thing in a particular way, and by dictum had stated that this latter evidence was admissible, notwithstanding the presence of eyewitnesses.

On the other hand, evidence of a person's habit or custom to do an act in a certain manner in order to prove that he was or was not negligent on a particular occasion is clearly distinguishable from the evidence of the routine practice or custom of a business establishment to conduct its business in a certain manner in order to prove that it performed a relevant act in accordance with its practice and custom. In the former situation there is a natural inclination for the courts, as a requisite to the admissibility of evidence, to require a showing that there is no better evidence such as eyewitnesses available. In the latter it is manifest that the evidence is acceptable, not only because of the obvious difficulty of proving a specific instance of the doing of an act in the course of business, but because more often than not such evidence is more reliable than the testimony of eyewitnesses. As stated by an eminent scholar on the subject, "the custom of a business organization or establishment, if reasonably regular and uniform, is usually received much more willingly by the courts, perhaps because there is no temptation to confuse this with evidence of character." (McCormick on Evidence, § 161, p. 343.)

Thus, we do not believe that the decisional law on this subject had been settled prior to the adoption of the Evidence Code. In fact, we have been unable to uncover a single California Supreme Court decision which has squarely extended the "no eyewitness" requirement to the routine day in and day out habit or custom of a business establishment. And, we are reluctant to believe that the Supreme Court would have

done so had this exact question been presented for its consideration.[2]

Furthermore, before King testified, the respondent Robinson had introduced into evidence work orders relating to the work done on the Chevrolet station wagon by Sanger Motor Sales. Among other things, these work orders indicated that the car had been "repainted," but there was no elaboration on what the procedure of repainting entailed, nor was there any mention that its headlights had been adjusted. Hence, standing alone, the work orders created a logical inference that the headlights of the station wagon had not been adjusted. Consequently, Sanger Motors was entitled to rebut this inference and to explain why there was no reference to headlight adjustment in the work order by evidence of its custom and practice in this respect.[3] To hold otherwise would be to hold that respondent could use Sanger Motor Sales business procedures, such as its work order, requisitions and similar procedures, against it without permitting this appellant to explain such procedures by evidence of its customary routine business practice in relation thereto unless it could

---

[2]See *Hughes* v. *Pacific Wharf etc. Co.*, 188 Cal. 210 [205 P. 105]; see also *Roberts Distrib. Co.* v. *Kaye-Halbert Corp.*, 126 Cal.App.2d 664, 676 [272 P.2d 886], wherein the court stated: "Evidence of a habit of doing a thing in the course of business is, if clearly shown as a definite course of action, admissible as indicating that, on a particular occasion, the thing was done as usual."

[3]With reference to the work orders, Cecil King testified as follows:

"Q. I notice on the shop order here it says, 'Paint complete, two-tone.' There is nothing in there about masking or stripping. Why not?

A. Well, that's part of the paint job. I mean, that's preparing your unit for a job. You couldn't list taking headlights off, taking the door and knob off, or a fender weld or anything like that. It's just—it isn't put down. It's just natural.

Q. There is nothing said on there either about adjusting the lights. Why not?

A. This is another part of the paint job. I mean, you've removed something; you have to put it back on. You have to put it where it meets roadability.

Q. All right. During the course of time that the car is in the shop are there any other jobs that would ordinarily be done in the ordinary course of business out there that would not show up on a work order?

A. Surely. Like if you had raised the hood there to paint around the seam. Maybe a little paint got on the spark plug or on the points or the carburetor and he goes to back it out of the shop and it doesn't function. He automatically goes to it, straightens it out. There is no work order put on it. It's just natural.

Q. All right. Are there any other jobs that require adjustment by a screw driver that would be done that wouldn't show up on a work order?

A. Well, there is a lot of little things that is done, yes. There might be a little rattle or a lot of those little things, T mean, that you do naturally that you don't charge for. In other words, it's in your overall bid on a paint job."

also be shown that there were no eyewitnesses to the challenged transaction. This in turn would have effectively and unfairly deprived the business establishment from using competent evidence to explain its business procedures, which often is far more effective in the eyes of the jury than the hazy memory of an eyewitness.

 Respondent argues that even if this were so Harvey Himes, the owner of Sanger Motor Sales, was the one to testify and not Cecil King. King, however, testified that he had been an automobile mechanic for at least 15 years; that in 1963 he was a salesman at Sanger Motor Sales, training for assistant sales manager, that he subsequently became assistant sales manager and ultimately sales manager; and that at the time he was acquainted with automobile painting practices in general, and in particular with the automobile painting practices and procedures employed at Sanger Motor Sales. Consequently, respondent's argument simply goes to the weight and not to the admissibility of King's testimony. As stated in *Peterson* v. *Permanente Steamship Corp.*, 129 Cal.App.2d 579, 590 [277 P.2d 495] (cert. den., 349 U.S. 953 [99 L.Ed. 1278, 75 S.Ct. 882]):

"Custom or usage is a matter of fact to be testified to as such by witnesses qualified by adequate knowledge. It can be proved by instances or by direct testimony of its existence by such witnesses [citations omitted]."

 In any event, respondent cannot prevail on this point because she did not properly object to the question propounded to the witness. In other words, although she objected to the question on the ground of "no foundation," she did not specify the exact basis for this deficiency. It is settled that objections must be accompanied by a reasonable, definite statement of the grounds. The purposes of the requirement are that the judge may understand the question raised, and that the adversary may have an opportunity to remedy the defect if possible (McCormick on Evidence, § 52, p. 117).

 Hence, it has been held that a general objection to a question put to the witness (an objection which does not specify the particular defect) is insufficient and is a waiver of the defect unless the question is objectionable from every standpoint and the answer inadmissible under any theory (*Bundy* v. *Sierra Lumber Co.*, 149 Cal. 772 [87 P. 622]; *Short* v. *Frink*, 151 Cal. 83 [90 P. 200]). Likewise, it has been held that such bare statements as "no proper foundation laid" or "the proper foundation has not been laid," which

are directed to the failure to establish the conditions of admissibility of evidence conditionally admissible, are insufficient (Witkin, Cal. Evidence (2d ed. 1966), § 1293, p. 1196). As stated in *People* v. *Modell*, 143 Cal.App.2d 724, 730-731 [300 P.2d 204] : "We need not inquire whether there was such a defect in the foundation for the evidence as would have made it the duty of the court to sustain a sufficient objection. The court was not given an opportunity to pass upon such an objection. It was not the duty of the court or the district attorney to divine the reasons for the objection which defense counsel had in mind. They should have been stated. Error must be predicated upon rulings which the court makes respecting the merits of objections to the admission of evidence." The *Modell* court further said, quoting from *People* v. *Tolmachoff*, 58 Cal.App.2d 815, 826 [138 P.2d 61] : "Where, as here, the proffered evidence is allegedly imperfect because of the lack of preliminary proof, which might or might not have been supplied by the party offering such evidence, the objection must be specific and it must point out the alleged defect. If this is not done, the objection cannot be urged on appeal."

In the instant case it is conceivable that when the trial court ruled on respondent's objection it had assumed that it was directed solely to the ability of the witness to testify on the business practices of Sanger Motor Sales. In fact, the "no eyewitness" argument was made for the first time by respondent in support of her motion for a new trial. It is, therefore, reasonably apparent that appellant Sanger Motor Sales was not given the opportunity to lay a proper foundation, which probably could have eliminated the reason for respondent's objection. In other words, it is doubtful that Sanger Motor Sales could have produced an employee who could actually recall having adjusted the headlights on the station wagon without relying heavily on the business practice or custom of the company in effect at that time. Consequently, if respondent had specified the reason for her objection when the objection was made, it is possible and even probable that the alleged defect could have been cured. Hence, her objection was waived, and should not have been considered for the first time when respondent moved for a new trial. In granting a new trial on this ground, the court abused its discretion.

It is true, as respondent contends, that the granting or denial of a new trial is a matter resting in the sound discretion of the trial court and that its decision should not be disturbed on appeal, except upon a manifest and unmistakable

abuse (*Holling* v. *Chandler*, 241 Cal.App.2d 19 [50 Cal.Rptr. 219]). However, where a new trial is granted solely because of an alleged error of law which did not occur during the trial, there is no legal ground for granting the new trial, and a trial court which purports to do so abuses its discretion (*Mattina* v. *Conant*, 177 Cal.App.2d 23 [1 Cal.Rptr. 820]; *Bua* v. *G. I. Taxi Co.*, 186 Cal.App.2d 612 [9 Cal.Rptr. 118]). Since the only alleged error assigned to the trial court by respondent is the disputed testimony of Cecil King, and since we have determined that no error was committed in this respect, we must reverse unless the court correctly granted respondent's motion for a new trial because of ''newly discovered evidence.''

Respondent relies on *Malkasian* v. *Irwin*, 61 Cal.2d 738 [40 Cal.Rptr. 78, 294 P.2d 822], for the proposition that the decision of the trial court should be upheld even where the error is minor or debatable. That case, however, is clearly distinguishable. First, even if it is assumed that the admissibility of Cecil King's disputed testimony was debatable, respondent waived her right to raise this issue by her failure to properly object. Second, in *Malkasian* the trial court had intended to grant a new trial because of the insufficiency of the evidence, and had unequivocally indicated that there had been a miscarriage of justice. The court, however, had failed to specify insufficiency of the evidence as a ground for granting the new trial in its order, and thus this ground could not be considered on appeal. Consequently, the Supreme Court, in discussing the alleged errors, held that in that case the trial court's discretion should not be disturbed even though these errors were debatable. In the instant case there was ample evidence to justify the verdict, and the trial court expressly denied the respondent's motion for a new trial on this ground. In fact, after reading the entire record, we are inclined to believe that the disputed testimony had little if any effect on the ultimate verdict.

## II

In moving the trial court for a new trial on the ground of ''newly discovered evidence'' respondent contended (and now contends) that she was surprised by the disputed testimony of Cecil King, and so supported her motion for new trial with the declaration of Dean White, the manager of an auto painting establishment. In this declaration Mr. White declared that he was familiar with the standard and custo-

mary methods by which automobiles are painted, and that under said methods it is not necessary to remove the headlights or any part of the headlight mechanism before an automobile (including a 1957 Chevrolet station wagon) is painted. He further declared that even in the event that the chrome strips of seal-beam headlight units are removed for the purpose of painting an automobile (including a 1957 Chevrolet station wagon), this removal would have no effect upon the adjustment of the headlights when they are replaced because the headlight adjusting screws are not removed or readjusted by such a procedure.

We have carefully considered Mr. White's declaration, and we have concluded that when this declaration is viewed in light of the entire record it is evident that the trial court also abused its discretion when it granted respondent's motion on this ground. This is so because (1) respondent did not meet the five conditions prescribed by the Supreme Court to justify the granting of a new trial,[4] (2) there was sufficient evidence of contributory negligence to support the jury's verdict and respondent's new evidence has no pertinence to this issue, and (3) respondent did not act with due diligence.

1) The respondent's "newly discovered evidence" was available at the time of trial and its availability as well as its materiality was (or should have been) known to the respondent. This follows for the condition of the headlights was one of the major issues in relation to her charge of negligence against appellant Sanger Motor Sales, and she knew that the automobile had been in this appellant's shop and had been repainted. In fact, that she was aware of and prepared to meet this issue is evidenced by the fact that she had subpoenaed David Haugh to testify on rebuttal even before Cecil King had testified. Haugh described the operation of removing seal-beam lights from a Chevrolet of the kind which

---

[4]The Supreme Court has set forth five conditions, each of which must be present to justify the granting of a new trial on this ground. These conditions are:

"1. That the evidence and not merely its materiality be newly discovered;

2. That the evidence be not cumulative, merely;

3. That it be such as to render a different result probable on retrial of the cause;

4. That the party could not with reasonable diligence have discovered and produced it at the trial;

5. That these facts be shown by the best evidence of which the case admits." (*People* v. *Williams,* 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353].)

Sanger Motor Sales sold to Neal and stated that they could be removed and replaced without any adjustment of the beam. Although he admitted that he did not paint cars and was not familiar with the process of painting cars, he nevertheless testified that there would be no adjustment of the lights during a painting job.

Moreover, the declaration of Dean White indicates that his testimony would be cumulative of the testimony already given by David Haugh, and if not cumulative it would be given primarily for impeachment purposes. In other words, the testimony of King was in relation to the business practices of Sanger Motor Sales, and since the proposed testimony of Dean White is similar to Haugh's testimony, its principal value is in relation to painting standards in general, and thus to discredit King's testimony. It is generally held that a new trial is not compelled by "newly discovered evidence" which is offered for impeachment purposes only. (*Dankert* v. *Lamb Finance Co.*, 146 Cal.App.2d 499 [304 P.2d 199].)

Finally, it is highly improbable that Dean White's testimony would have had any effect on the verdict of the jury, or that it would render a different result probable on a retrial of the case. This is true because there is ample and persuasive evidence in support of appellant's contention that the hazardous position of the Buick (with its headlights shining toward oncoming traffic), was the proximate cause of the accident. Moreover, there is ample evidence of respondent's contributory negligence. Furthermore, King not only testified that it was the business custom of Sanger Motor Sales to adjust headlights when it repainted automobiles, but he also testified that he had driven the station wagon at night on two occasions after it had been repainted, and that its lights were functioning properly on those occasions. If the jury did not believe this portion of his testimony, it is unlikely that they would have believed the remaining portion of the testimony. Conversely, if they believed him when he stated that the lights were functioning properly on the two occasions when he drove the vehicle at night, his testimony as to the business custom would not have mattered.

2) There was sufficient evidence of contributory negligence to support the jury's verdict on this basis alone, and respondent's new evidence has no pertinence to this issue. In other words, there was evidence that all occupants of the pickup truck (including Ruth Robinson) were drinking during the

trip which ended in tragedy. Respondent and her girl friend persuaded Napier to take them to Avenal, although he told the women that he did not believe that he had enough gas to get there. Shortly before the accident Napier and his friend Dowdy were in the process of siphoning gasoline from Dowdy's Buick to the pickup, with the Buick stationed in a misleading and confusing position, obviously creating a hazard to approaching traffic. The respondent and her girl friend were seated where they could see the entire situation and did nothing to insure their safety. As stated by the court in *Parker* v. *Southern Pacific Co.*, 204 Cal. 609, 614 [269 P. 622]:

"Under this state of the record it cannot be said that the jury did not pass upon the issue of contributory negligence of the plaintiff. Such being the case, and as the alleged newly discovered evidence had no pertinency to the issue of contributory negligence, the trial court committed prejudicial error in granting the motion for a new trial on the ground of the newly discovered evidence alone if the evidence on the issue of contributory negligence was sufficient to support the general verdict for the defendants."

Respondent does not deny that the evidence on the issue of contributory negligence was sufficient to support a general verdict for the appellants. To the contrary, she states in her brief, "there is no question but that there was evidence to support a finding of contributory negligence by Ruth Robinson." She contends, however, that this case is distinguishable from *Parker*, for in that case the new trial was granted on the ground of newly discovered evidence alone, while here it was also granted because of the error in admitting King's disputed testimony. This argument has no merit in view of our holding that no such error was committed.

3) Even if it is assumed that respondent was surprised by Cecil King's testimony, she cannot prevail because she did not act with diligence thereafter. It is settled that a party may not rely on "newly discovered evidence" as a ground for a new trial unless he has made his prejudice known to the court at the earliest possible moment (*Kauffman* v. *DeMutiis*, 31 Cal.2d 429, 432 [189 P.2d 271]; *People* ex rel. *Dept. of Public Works* v. *Donovan*, 57 Cal.2d 346 [19 Cal. Rptr. 473, 369 P.2d 1]). In *Kauffman* the court said: ". . . where a situation arises which might constitute legal surprise, counsel cannot speculate on a favorable verdict. He must act at the earliest possible moment for the 'right to a

new trial on the ground of surprise is waived if, when the surprise is discovered, it is not made known to the court, and no motion is made for a mistrial or continuance of the cause.' '' The record indicates that the testimony of Cecil King was concluded on December 7, 1965, at approximately 11:45 a.m. The court then announced a recess until 1:30 of the afternoon of that day. However, no claim of surprise was made by the respondent, nor did she request a continuance at that time or later in the day when the court reconvened. To the contrary, she called David L. Haugh as her first rebuttal witness. At the conclusion of Haugh's testimony respondent rested again without making her surprise known to the court or requesting a continuance. At approximately 1:47 p.m. of the afternoon, after both parties had rested, the court and counsel remained in session outside of the presence of the jury discussing matters of law and instructions until a recess was taken at 3 p.m. Still no claim of surprise was made by respondent, nor did she request a continuance. The court reconvened on the following morning at 9:08 a.m., and once again respondent made no request for leave to reopen her case or for a continuance. Instead, she proceeded without objection to argue her case to the jury.

Under these circumstances it is manifest that respondent did not act with reasonable diligence and that she waived her right to request a new trial because of ''newly discovered evidence.'' Not only did she fail to advise the court of her surprise, but she failed to ask the court for a reasonable continuance time and time again; and this, notwithstanding the fact that her new evidence merely relates to standard automobile painting practices which could have been obtained with minimal effort.

The order granting a new trial is reversed with directions to enter a judgment on the verdict in favor of Sanger Motor Sales and Charlie Allen Neal, and against Gertrude Baron, as administratrix of the estate of Ruth Robinson.

Conley, P. J., and Stone, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 24, 1967.