[No. B221409. Second Dist., Div. Eight. Jan. 6, 2012.]

GEORGE SANTILLAN et al., Plaintiffs and Appellants, v.
ROMAN CATHOLIC BISHOP OF FRESNO, Defendant and Appellant.

**COUNSEL**

Jeff Anderson & Associates, Jeffrey R. Anderson; The Arkin Law Firm, Sharon J. Arkin; Drivon, Turner & Waters, Laurence E. Drivon, Robert T. Waters; Kiesel, Boucher & Larson, Raymond P. Boucher and Anthony M. De Marco for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; Weakley, Arendt & McGuire, Rosemary T. McGuire and James D. Weakley for Defendant and Appellant.

OPINION

**RUBIN, Acting P. J.**—George Santillan and his brother Howard Santillan sued the Roman Catholic Bishop of Fresno for childhood sexual abuse by one of the diocese's former priests. A jury found that their claims were time-barred because there was no evidence that the diocese knew that the priest was committing such acts either before or during the time when the Santillans were being abused. The trial court granted a new trial as to Howard based on newly discovered evidence of another person who had reported that the same priest was abusing him during the period when Howard was being molested. The trial court denied the new trial motion as to George because the new witness's report occurred after the abuse of George had stopped, and entered judgment for the diocese against George.

George appeals from the judgment, contending that the jury was improperly instructed and that certain evidence was wrongly excluded. He also contends the trial court erred by denying his new trial motion. The diocese cross-appeals from the order granting a new trial for Howard. We affirm the judgment and both new trial orders.

## FACTS AND PROCEDURAL HISTORY

1. *Procedural Background and Issues on Appeal*

Brothers George and Howard Santillan[1] were molested by Anthony Herdegen, the parish priest in their hometown of Wasco. George was abused from the time he was 10 years old in 1959 until sometime in late 1965. Howard was abused from the time he turned six in 1960 until sometime in 1973. The abuse progressed from groping and fondling to sessions of full-body oil rubs and mutual masturbation in Herdegen's living quarters in the parish rectory.

The Wasco parish was operated by, and under the jurisdiction of, the Roman Catholic Bishop of Fresno, a corporation sole (the Diocese). The Diocese was run by its only shareholder—whatever individual happened to be the bishop at any particular time. The Santillans sued the Diocese in 2003 during the one-year revival period of previously time-barred childhood sex abuse claims. (Code Civ. Proc., § 340.1, subds. (b)(2), (c).)[2]

---

[1] For ease of identification, we will refer to George and Howard separately by their first names and collectively as Santillans.

[2] All further undesignated section references are to the Code of Civil Procedure, unless otherwise stated.

There is no dispute that Herdegen sexually abused the Santillans when they were boys attending the Wasco parish school. The Santillans concede that they never told anyone about the abuse until many years later, long after the statute of limitations in effect at that time had expired. Claims such as theirs against churches and other entities were revived for the calendar year 2003, but in order to qualify for that revival window, the Santillans had to show that the Diocese knew or had reason to know that Herdegen had engaged in unlawful sexual conduct before or during the time when he abused them. (§ 340.1, subds. (b)(2), (c).)

In *Santillan v. Roman Catholic Bishop of Fresno* (2008) 163 Cal.App.4th 4 [77 Cal.Rptr.3d 343] (*Santillan I*), we reversed the trial court's grant of summary judgment for the Diocese on that issue. At the time, the Santillans relied solely on circumstantial evidence that Barbara Zeilman, the elderly part-time parish housekeeper for Herdegen, knew what was going on behind the closed doors of Herdegen's living quarters, and failed to fulfill her employment duty to report that information to the Diocese.

We first held that evidence of Zeilman's tearful apologetic response when asked years later by the Santillans' mother why she never reported Herdegen's conduct was circumstantial evidence that Zeilman knew about the abuse when it took place. We also held that the deposition testimony of former Cardinal Roger Mahony, who served in several high-level administrative positions at the Diocese from 1962 to 1980, raised triable issues of fact whether Zeilman, who had since died, had an employment-based duty to report what she knew. If so, then her knowledge would be imputed to the Diocese for purposes of the statute of limitations' notice requirement. (*Santillan I, supra*, 163 Cal.App.4th at pp. 11–12.)

On remand, the case went to trial. All issues of liability, including the statute of limitations, were tried to the jury. The jury returned a special verdict that found Herdegen had committed an act of unlawful sexual conduct against both Howard and George. However, in response to the next question on the special verdict form, the jury found that the Diocese did not know or have reason to know that Herdegen had committed an act of unlawful sexual conduct before the last act of such conduct against either George or Howard occurred. In other words, the jury found that the Diocese did not have notice of Herdegen's misconduct until after he had stopped molesting the Santillans. Because this resolved the statute of limitations issue in the Diocese's favor, the jury was instructed not to answer further questions regarding the statute of limitations or liability, and the trial court entered judgment for the Diocese.

While the jury was deliberating, however, George's lawyer received a phone call from a man who said he had been an altar boy at the Wasco parish in the mid-1960's, that he too had been inappropriately touched by Herdegen, and that his mother reported this to the principal of the parish school that he attended. Instead of doing anything about the report, however, the boy was expelled from the school soon after, he claimed. Despite extensive discovery by the Santillans, including requests for information concerning any reports of sexual misconduct by Herdegen, the report of this incident was not disclosed.

Based on this, the Santillans brought a motion for a new trial on the ground of newly discovered evidence. The trial court granted the motion as to Howard, because the new witness said he reported the incident to the parish school in 1967, at a time when Howard was still being molested by Herdegen. However, because Herdegen stopped molesting George in late 1965, the trial court found that the evidence did not provide the Diocese timely notice during the period when George was being abused, and denied the new trial motion as to George.

George appeals, contending the trial court erred by instructing the jury that when determining the statute of limitations notice issue, it could not rely on innocuous or ambiguous conduct by Herdegen, standing alone, as evidence of notice. He also contends that the trial court erred when it answered a jury question by limiting the jury's consideration of conduct to events that occurred before the last act of sexual abuse; the trial court erred by excluding evidence to impeach Mahony; and that the trial court should have granted him a new trial as well. The Diocese cross-appeals, contending a new trial was not warranted for Howard because he did not act with diligence in his efforts either to discover the new witness or in alerting the court after he finally did so, and that the new evidence was not sufficiently material to justify the grant of a new trial.

## 2. Facts Concerning the Statute of Limitations

### A. Conduct at the Seminary

In the late 1940's and early 1950's, Herdegen was an instructor at the Ryan Seminary, a boarding school operated by the Diocese for high school boys who were interested in becoming priests. Three witnesses who were students at the Ryan Seminary during that period testified that Herdegen sometimes gave them alcohol rubs or massages to help treat sports injuries. The witnesses consistently testified that these occurred at their request, involved only minimal disrobing, lasted but a few minutes, and took place in a hallway

or other setting open to passersby, including the school's rector, who sometimes walked by as the massages took place. The three witnesses said there was absolutely nothing sexual or otherwise improper about the massages.

Before this testimony took place, Mahony was questioned in the abstract as to how he would have reacted upon learning that a priest was giving alcohol massages to male students. Mahony testified that no priest "should be giving anyone a massage, anywhere, period." Had he heard of Herdegen's conduct in the 1960's, when Mahony was supervising priests, he would have been upset and outraged because such conduct is "totally incompatible with a priest," and would have likely led to an investigation.

### B. *Knowledge of the Housekeeper*

Priests were not allowed to have children alone with them in their bedrooms. Housekeeper Zeilman was frequently present when George and Howard showed up at the rectory and went with Herdegen inside his private rooms.[3] Herdegen massaged and masturbated the boys while they lay on a sheet Herdegen spread on the floor. The sheets would end up with semen and oil stains, and Zeilman washed those sheets.

When the Santillans' mother learned of the abuse years later, she asked Zeilman why Zeilman never said anything. Zeilman's only response was to say that she was sorry.

Zeilman's daughter testified that Zeilman never said anything about having suspicions that Herdegen was sexually molesting anyone. The daughter helped Zeilman wash the sheets, and never noticed any semen or oil stains. When the daughter proposed sending her son off for an overnight visit with Herdegen, Zeilman expressed her approval, something the daughter testified her mother would never have done had she believed Herdegen was a child molester.

Mahony testified that from the 1960's to the 1980's, a priest who suspected that another priest was molesting children was expected to report his suspicions to his superiors at the Diocese. When asked about lay employees in a parish, Mahony said that back then there were no handbooks or procedures in place for either priests or lay employees. As a result, Mahony believed that "people like housekeepers would have no idea that there was any . . . obligation to report to anyone in the church, because there . . . was nothing in writing that would tell them that."

Even so, Mahony agreed that protecting children in its care was a top priority for the church, including lay staff such as housekeepers. Asked

---

[3] Herdegen molested George and Howard separately, not at the same time.

whether he would expect a housekeeper who suspected a priest was molesting a child to report it "up the chain of command," Mahony answered, "Well, I would suspect they'd tell somebody . . . ." If Mahony learned that a housekeeper with such suspicions had kept quiet, he would have been very concerned and might have considered firing her.

Mahony was then asked whether the Diocese would expect a parish housekeeper who found semen-stained sheets after boys routinely stayed alone with Herdegen in his living quarters to report that "up the chain," Mahony answered: "Well, maybe she wouldn't up the chain, but she should sure tell somebody." Pressed to identify to whom the housekeeper should report, Mahony said: "Well, in a small town, most everybody knows everybody [a]nd there would be, I would think, a lot of people that she would tell. Because if there's no other priest in the town, she may not feel it's her role to go to Fresno to report it, but she would tell somebody. If a housekeeper really felt a child was in danger, she'd have to do something. I mean, it's just instinctive."

Pressed further as to whether he would have expected the housekeeper to report her concerns to the Diocese, Mahony said he "would expect her immediately to contact somebody, immediately." When asked whether that would include the Diocese, Mahony said, "Well, certainly, and maybe a pastor, the dean in Bakersfield possibly, someone . . . [¶] [who was] in a position to do something about it." Asked whether that would be so as a matter of Diocese policy, Mahony answered: "Again, if . . . anyone has knowledge that a child is in danger, physically, emotionally, sexually, anyone, any human being has to do something about it. You cannot just leave that alone." When asked whether that was a matter of common sense, Mahony said it was. On cross-examination, Mahony clarified that a housekeeper such as Zeilman working at a parish from 1960 to 1973 was not obligated as a condition of employment to report to the Diocese any suspicions that a priest was molesting children because at that time there were no employee handbooks.

### C. *Herdegen Touched Children While on the Parish School Playground*

George testified that when he was a student at St. John's elementary school, Herdegen would sometimes touch him through his clothes. Herdegen also sometimes hugged other students. These events took place in the schoolyard while nuns and teachers were nearby.

## 3. *Facts Concerning the New Trial Motion*

The jury began deliberating on April 2, 2009, and returned its special verdict the next day. Judgment on the verdict was entered April 9, 2009. On

May 11, 2009, counsel for the Santillans moved for a new trial based on information from a previously unknown witness who contacted them about two hours after deliberations began on April 2.

The witness, Patrick Wright, submitted a declaration stating that he had lived in Wasco and attended St. John's school there in the mid-1960's. Wright said he served as an altar boy for Herdegen, and on several occasions Herdegen would come up to Wright while Wright was in the dressing area after mass, "bend over, put his hands on each of my cheeks and stare deeply into my eyes as if he was about to kiss me on the lips." On another occasion while alone with Herdegen in the dressing area, Herdegen "stood in front of me, began praying in [L]atin, and put one hand behind my head and began pulling my face to his groin. He pulled my head so that my face was in his cassock." Finally, in late 1967, Herdegen followed Wright into the altar boys changing area, blocked him from behind, and began to massage Wright's shoulders. When the massage ended a minute later, Herdegen asked if Wright would like to go to the rectory with him for a glass of milk. Disturbed by the incident, Wright went home and told his mother what had happened. Wright's mother took him to see Sister Vidaline, who was the school principal. Wright told her what had happened. Soon after, he was told he could not serve mass anymore and was expelled from the school.

Wright moved away from Wasco in 1975 or 1976 and never returned. At the time of the trial, he was a resident of Arizona. On March 18, 2009, Wright's son told him the Santillans were going to trial against Herdegen. Wright found Internet articles identifying a Jeff Anderson as George's lawyer. Wright tried unsuccessfully to reach Anderson in California, phoning a lawyer by that name who was in Sacramento. On April 2, 2009, lawyer Jeff Anderson from Sacramento returned Wright's call and told him he was not George's lawyer but said there was a lawyer by the same name in Minneapolis. Wright called that Jeff Anderson's law office and said he had information about the case.

The Jeff Anderson in Minneapolis was in fact one of George's lawyers. That Anderson got the message from his office about two hours after deliberations began on April 2. He was on his way back to the courtroom to respond to a question from the jury, and once he completed that task, Anderson phoned Wright and spoke to him briefly. Anderson called Wright again later that day and had a longer conversation about Wright's experiences with Herdegen. Wright spoke with Anderson and Howard's lawyer a few days later.

The Diocese opposed the motion on several grounds: (1) the Santillans' delayed discovery of Wright resulted from their failure to use reasonable diligence during discovery, especially because Wright's name was listed on a

roster of parish school students produced by the Diocese; (2) the Santillans did not use reasonable diligence because they did not bring their discovery of Wright to the court's attention until after the jury reached its adverse verdicts; and (3) the new evidence from Wright was not material because he did not report Herdegen to an agent of the Diocese, the report occurred after the abuse of George had ended, what happened to Wright was not unlawful sexual conduct, and Wright's statement was not credible.

The Santillans' reply brief argued that they used reasonable diligence, detailing the numerous witnesses their investigator tracked down and questioned. They also pointed out that they specifically sought discovery concerning complaints made against Herdegen and were told none existed, even though Wright said he made such a complaint.

The trial court found that the Santillans had used reasonable diligence during discovery by interviewing hundreds of witnesses, conducting numerous depositions, and poring through thousands of pages of documents. At no point was there even a suggestion that Wright had been one of Herdegen's victims, the court found. Because Wright lived in Arizona and was "beyond California subpoena range and because his status as a victim of . . . Herdegen was discovered so late, Wright was unavailable for appearance as a witness during the trial," making the evidence newly discovered, the court ruled. Based on these findings, the trial court granted the new trial motion as to Howard. Because Wright's report about Herdegen came after the abuse of George had stopped, the court denied the motion as to George.

## DISCUSSION

1. *The Trial Court's Instruction Regarding the Use of Ambiguous Evidence of Molestation Was Generally Correct*

   A. *The Requirement That the Nonperpetrator Have Notice*

The Santillans sued in 2003, long after their claims were barred by the statute of limitations in effect when they were molested. However, claims such as theirs were revived during 2003 by subdivision (c) of section 340.1, so long as they could show the Diocese "knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by an employee . . . or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person . . . ." (§ 340.1, subd. (b)(2).)

In *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531 [67 Cal.Rptr.3d 330, 169 P.3d 559] (*Doe*), our Supreme Court explained this notice requirement. First, the entity being sued for acts of molestation by its agent or

employee must have had knowledge or notice of the perpetrator's unlawful sexual conduct.[4] Second, the term "knew" in the statute means actual knowledge and the term "reason to know" refers to a type of constructive knowledge.[5] Third, this does *not* mean "inquiry notice," i.e., notice of facts that would put the entity on notice of a duty to inquire and thereby learn that molestation had occurred. Fourth, reason to know means that the entity defendant has acquired actual knowledge of facts from which a reasonable person of ordinary intelligence, or one of the superior intelligence of the actor, would either infer, or consider highly probable, that the agent had previously committed an act unlawful sexual conduct with the minor. (42 Cal.4th at pp. 545–549.)[6]

"Thus, the statute does not directly impute knowledge to the nonperpetrator defendant based on what that defendant should have noticed, but requires an assessment of the facts that the defendant *did* know in order to determine whether a reasonable person would have inferred the unlawful conduct.". (*Deutsch v. Masonic Homes of California, Inc.* (2008) 164 Cal.App.4th 748, 774 [80 Cal.Rptr.3d 368].) "Under *Doe*, notice is measured by the facts known to the defendant—either knowledge of the fact that prior unlawful conduct had occurred, or knowledge of facts from which such prior unlawful conduct should be inferred—not by facts which the defendant should have discovered or should have noticed." (*Id.* at p. 775.) Therefore, the *Doe* court expressly declined to construe section 340.1 as placing a duty of inquiry on nonperpetrators. (*Doe, supra*, 42 Cal.4th at pp. 548–549.)

## B. *The Notice Instructions*

The trial court instructed the jury in accordance with the principles announced in *Doe, supra*, 42 Cal.4th 531, and then added an instruction that the trial courts handling these coordinated actions have approved for use in

---

[4] The *Doe* court held that the term "unlawful sexual conduct" refers to the acts specified in section 340.1, subdivision (e), which defines "[c]hildhood sexual abuse" in terms of seven provisions of the Penal Code describing various prohibited sexual acts against minors. (*Doe, supra*, 42 Cal.4th at pp. 545–546.)

[5] The *Doe* court held that the phrase "otherwise on notice" was ambiguous, but was intended to prevent an entity defendant from disclaiming knowledge of its agent's unlawful sexual conduct because it had not received a formal complaint. (*Doe, supra*, 42 Cal.4th at p. 548.) George does not contend that the Diocese was "otherwise on notice" of Herdegen's sexual misconduct, and we therefore do not include it as part of our analysis.

[6] In the case of an entity defendant like the Diocese, which operates through an organizational hierarchy composed of various officers, agents, managers, and employees, the defendant's "reason to know" must refer to knowledge acquired by a sufficiently authorized representative of the entity. That person's knowledge must then be evaluated by the standard of either a reasonable person of ordinary intelligence, or of a person who has "superior," or specialized knowledge that would pertain to his evaluation of the facts he has acquired. We need not elaborate on that standard because that issue is not before us; its parameters will perhaps be determined by another court.

these cases: "Knowledge of conduct which is innocuous or which is ambiguous is not by itself notice of 'unlawful sexual conduct' or of a tendency or propensity to engage in such conduct. [¶] Ambiguous conduct is conduct which is capable of being understood in two senses, where one sense might suggest a tendency or propensity to engage in 'unlawful sexual conduct' with a child, but where another sense might suggest innocent conduct or might suggest wrongful conduct that did not involve a tendency or propensity to engage in 'unlawful sexual conduct' with a child." It is this instruction that George challenges on appeal.[7]

### C. *The Instruction on Ambiguous Evidence Was Generally Correct*

George contends that the trial court's instruction regarding the use of evidence of ambiguous conduct was wrong under *Doe, supra*, 42 Cal.4th 531. Based on our reading of *Doe* and the chain of authority it relied upon, we disagree.

In formulating the "reason to know" standard applicable to section 340.1, the *Doe* court looked to its earlier decision in *John B. v. Superior Court* (2006) 38 Cal.4th 1177 [45 Cal.Rptr.3d 316, 137 P.3d 153] (*John B.*), which held that tort liability for negligent transmission of HIV extends to situations where the defendant had reason to know of the infection. The *John B.* court in turn relied on section 12 of the Restatement Second of Torts, which explains that the "reason to know" standard applies when " 'the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.' " (*John B., supra*, at p. 1191, quoting Rest.2d Torts, § 12, subd. (1).) The same subdivision of the Restatement Second of Torts provides that this standard is used "throughout the Restatement of this Subject to denote the fact that the actor" had this level of information. (Rest.2d Torts, § 12, subd. (1), boldface omitted.) Furthermore, "the phrases 'reason to know' and 'should know' are used throughout the Restatement of Torts in the same sense as they are used in the Restatement of Agency. (See Restatement of Agency, Second, § 9.)" (Rest.2d Torts, § 12, com. a, p. 20.)

The Restatement Second of Agency, section 213, which governs the liability of a principal for the negligent or reckless conduct of his agent,

---

[7] The instruction was formulated and has been used throughout the coordinated trials of numerous actions against various Catholic Church entities for sexual molestation. The Diocese has asked us to take judicial notice of a case management order and a request for the same jury instruction by George's lawyer in another case as part of its contention that any claim of error was waived. Although we do not reach the waiver issue, we do grant the motion for judicial notice.

applies section 12 of the Restatement Second of Torts. (See Rest.2d Agency, § 213, com. a, p. 458 ["The rule stated in this Section is not based upon any rule of the law of principal and agent or of master and servant [but is instead] a special application of the general rules stated in the Restatement of Torts . . . ."].)

California appellate decisions construing section 213 of the Restatement Second of Agency have concluded that an employer's knowledge of conduct by the perpetrator that is ambiguous as to whether the perpetrator has committed unlawful sexual conduct is insufficient to satisfy the reason to know standard when determining whether an entity such as an employer can be held liable for an employee's acts of sexual abuse. The court in *Federico v. Superior Court* (1997) 59 Cal.App.4th 1207 [69 Cal.Rptr.2d 370] (*Federico*) overturned a trial court order denying a summary judgment motion by a hairstyling school that was being sued because one of its teachers molested the young child of a student who brought the child to school. In connection with a cause of action for negligent supervision of the teacher, the plaintiff's evidence concerning whether the school knew or had reason to know that the teacher was molesting children brought on to the school's premises consisted of events that "were not explicitly sexual, consisting of such occurrences as an unusually prolonged handshake, an overly friendly pat on the shoulder, or, on one occasion, [the teacher] having a younger child sit in his lap." (*Id.* at p. 1216.)

Applying the reason to know standard found in section 213 of the Restatement Second of Agency, the *Federico* court held that "[s]uch *contact was, at the time it occurred, ambiguous at worst* and did not result in any complaints to defendant by the children involved or their parents." (*Federico, supra,* 59 Cal.App.4th at p. 1216, italics added.) "Thus, even if the incidents described could be deemed a warning sign that [the teacher's] continued employment might pose a risk to minors, they cannot be used to impose liability for negligence on defendant, who had no actual knowledge, or reason to suspect, that they had occurred." (*Ibid.*; see also *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 396 [97 Cal.Rptr.2d 12] [applying *Federico* analysis to action for sexual abuse by a scoutmaster].)

These decisions make clear that in order to hold an employer liable for its employee's sexual abuse of minors, the reason to know standard set forth in section 213 of the Restatement Second of Agency precludes liability based solely on knowledge of conduct by the employee which is ambiguous in regard to his commission of such offenses. As noted above, the Restatement Second of Agency standard is merely an application of section 12 of the Restatement Second of Torts, which was applied in *John B., supra,* 38 Cal.4th 1177, then adopted for use in section 340.1 by *Doe, supra,* 42 Cal.4th at pages

546–547. Therefore, the reason to know standard used in the negligent supervision liability context is identical to the reason to know standard approved in *Doe*.

Although the *Doe* court did not expressly preclude a finding of notice under section 340.1 based solely on an employer's or principal's knowledge of ambiguous conduct by the perpetrator, its holding supports our conclusion. The court summarized the plaintiffs' allegations as follows: "[T]here are allegations that other police officers were aware of [the molesting officer's] pedophilic tendencies . . . because of his open interest in young boys, the favoritism he showed to certain of the scouts, including plaintiffs, his inappropriate fraternization with some scouts, including plaintiffs, both on the job and at his home, his alleged association with a known pornographer, and his trips to Thailand, where he was observed in the company of a young boy . . . ." (*Doe, supra,* 42 Cal.4th at p. 552.) These allegations were inadequate, the *Doe* court held, because they "fail to allege that defendants had knowledge of [the molester's] past unlawful sexual conduct with minors, which is the prerequisite for imposing upon these defendants liability for his subsequent sexual abuse of plaintiffs. That defendants had knowledge or notice of misconduct by [the molester] that created a risk of sexual exploitation is not enough under the express terms of the statute." (*Id.* at p. 552.)

If allegations of such strong warning signs of a sexual interest in minors were not enough under *Doe* to satisfy the notice requirement of section 340.1, then surely the employer's knowledge of conduct by the perpetrator that is ambiguous on the issue, without more, is also insufficient. In short, the instruction the trial court gave was generally correct.[8]

### D. *The Circumstantial Evidence Problem*

Apart from the issue whether a finding of notice may not be based solely on knowledge of ambiguous conduct by the perpetrator, George also contends the instruction was wrong because it precluded the jury from considering circumstantial or indirect evidence, which he says is ambiguous by its very nature.

According to George, the following evidence introduced at trial meets this criteria: (1) Herdegen's alcohol rubs of the seminary students, which qualified as lewd and lascivious conduct under Penal Code section 288 if those otherwise seemingly innocent massages sexually aroused Herdegen; (2) the

---

[8] We do not hold that the instruction is proper in all cases, however. In some cases, the evidence concerning notice to an employer or other entity defendant may not be ambiguous at all, rendering the instruction unnecessary. In this case, there was evidence of ambiguous conduct by Herdegen, such as the alcohol rubs that Herdegen gave some of the seminary boys.

Santillans' frequent visits to Herdegen's room, and the soiled and stained sheets that were left behind, both of which were inferentially witnessed by housekeeper Zeilman; and (3) hugging children on the school playground.

George also includes in this category evidence that (4) the Diocese once transferred Herdegen to work in a hospital established to treat sex offenders, raising an inference that the Diocese knew Herdegen had committed unlawful sexual conduct; (5) Mahony once considered transferring Herdegen to another parish as an administrator, a demotion that the Santillans' expert witness on church matters opined was a common response to learning that a priest was a child molester; (6) the rector of the seminary walked by while Herdegen performed alcohol massages, creating inferences that he might, or might not have seen them taking place; and (7) Zeilman's response that she was sorry when asked by the Santillans' mother why she never reported the abuse of her sons.

Notice is conferred by knowledge of *conduct by the perpetrator* that either shows he has committed prior acts of unlawful sexual conduct, or, at a minimum, that should lead the person learning of those facts to conclude from them that such conduct has occurred. Although this second group of facts described by George might be circumstantial evidence that the Diocese in fact had concluded that Herdegen was a child molester, or had observed facts suggesting as much, it is not evidence of *unlawful sexual conduct by Herdegen* from which the Diocese should have inferred that fact. Instead, this evidence skips over that step in the analytical process and, if believed, would require the jury to conclude that the Diocese had learned about past molestations even without specific evidence of what led the Diocese to that conclusion. Nothing in the disputed instruction precluded the jury from doing just that. In short, the second set of facts described above (identified by numbers (4) through (7)) has nothing to do with the *Doe* court's requirements for proving notice based on the Diocese's knowledge of facts concerning Herdegen's own conduct that should have led the Diocese to conclude that Herdegen had committed unlawful sexual conduct.

We do not suggest that this evidence is irrelevant, only that it is not evidence of Herdegen's *conduct* and does not call into question the general accuracy of the ambiguity instruction. However, it does point out the potential need for a clarifying instruction so the jury can determine how to differentiate between direct or circumstantial evidence of conduct by the alleged perpetrator that is either innocuous or ambiguous and circumstantial evidence that is not derived from the perpetrator's conduct, including actions taken by the nonperpetrator, such as reassigning a priest to another parish.

In this case, for instance, if a priest who entered Herdegen's rectory heard unusual sounds coming from Herdegen's room, then saw an altar boy leave the

room while pulling up his pants, followed by Herdegen doing the same, that would be circumstantial but arguably unambiguous evidence that Herdegen had just molested the boy.

However, evidence that Herdegen was transferred to a hospital or administrative post, combined with testimony that those assignments were regularly made for priests believed to be child abusers, is not by itself circumstantial evidence of facts that unambiguously showed past unlawful sexual conduct by Herdegen. Instead, as just stated, it is circumstantial evidence that the Diocese had determined for itself that Herdegen had committed unlawful sexual conduct, without regard to how it reached that conclusion. Under those circumstances, the jury could reasonably infer that the Diocese in fact had notice of child abuse by Herdegen—and had concluded as much—even though the actual conduct by Herdegen was ambiguous. Therefore, along with circumstantial or direct evidence that the Diocese knew of conduct by Herdegen that was ambiguous as to whether he had committed unlawful sexual conduct, there may also be circumstantial or direct evidence that the Diocese had the requisite notice based on its own actions.

■ We merely hold that where the only evidence concerning whether the Diocese had notice under section 340.1 is based on its knowledge of conduct by the priest, whether that evidence be direct or circumstantial, the conduct must be unambiguous as to whether the priest committed unlawful sexual conduct, and it is proper for the court to so instruct.

These are not easy distinctions, and we can see the propriety of a clarifying instruction in some cases. At oral argument, George's lawyer contended that such an instruction should have been given. However, although the record shows that George made an objection to the ambiguous evidence instruction, he does not contend, and the record does not show, that he ever requested such a clarifying instruction. As a result, if the instructions given were generally correct statements of the law, that issue is waived. (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1162 [74 Cal.Rptr.2d 510].)

In determining whether instructional error occurred, we must read the instructions as a whole. (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 462 [114 Cal.Rptr.3d 392].) The instruction did not tell the jury it could not consider any ambiguous or circumstantial *evidence* concerning whether the Diocese had notice. It simply told the jury that evidence that the Diocese knew about conduct by Herdegen that was ambiguous as to whether he had committed unlawful sexual conduct was not enough *by itself* to find that the Diocese had notice of Herdegen's sexual misconduct. The jury was also instructed to weigh and consider all the evidence, that circumstantial and direct evidence had the same strength, and

that whether the evidence was direct or circumstantial it should give each piece of evidence whatever weight the jury felt it deserved. When these instructions are read together, the jury was told to consider circumstantial evidence, but that knowledge by the Diocese of conduct by Herdegen that was ambiguous on the issue of sexual abuse of children, without more, was not enough to find the Diocese had notice under section 340.1.

Because the instructions as a whole were correct statements of the law, and because George did not request an instruction to clarify or explain how the jury could use circumstantial evidence, George has waived his claim that a further clarifying instruction should have been given.[9]

The same is true of George's contention that the instruction was improper because it effectively imposed the criminal law "beyond a reasonable doubt" burden of proof, under which the jury is told that if two inferences can be drawn from the evidence—one favorable to the defendant, and one that is unfavorable—then the jury must adopt the favorable inference. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 931 [61 Cal.Rptr.3d 903].) In addition to the other instructions just discussed, the jury was expressly instructed that the burden of proof was by a preponderance of the evidence, not the criminal law's beyond-a-reasonable-doubt standard. Therefore, the instructions did not mislead the jury into applying a beyond-a-reasonable-doubt standard to the notice evidence.

## 2. *Jury Instruction Regarding Time Periods Applicable to the Evidence*

The first three questions on the special verdict form concerned the statute of limitations issue. Questions concerning liability and damages followed, but were to be answered only if the jury found that the Santillans' claims were not barred by the statute of limitations. Question No. 2 asked the jury to determine whether the Diocese knew or had reason to know Herdegen had committed an act of unlawful sexual conduct before his last such act against the Santillans. If the answer was yes, then question No. 3 asked whether the Diocese failed to take reasonable steps to avoid acts of unlawful sexual conduct by Herdegen before his last such act against the Santillans. Because the jury answered no to question No. 2, it never went on to reach the remaining questions.

The jury asked the following question during its deliberations: "We would like to clarify that the dates we are looking at are up through 1973 only when the unlawful sexual conduct was taking place. If we get past Question 2, are

---

[9] On remand, the trial court is free to reconsider whether to give the ambiguous conduct instruction or to consider any clarifying instruction requested by the parties.

we still only using information up through 1973? We understand we use all dates for assessing damages."

The trial court said it did not understand the question. With the agreement of counsel for the parties, the court answered the question as follows:

"For purposes of the statute of limitations issue, consider evidence of facts relating to such issue up until the last day of alleged unlawful sexual conduct.

"For purposes of plaintiff's [sic] negligence claims, consider evidence of facts occurring up until the last date of alleged unlawful sexual conduct.

"For purposes of plaintiff's [sic] claim that the diocese ratified the conduct of Anthony Herdegen, consider evidence of facts relating to such claim up until the present.

"For purposes of evaluating damages, consider evidence of facts relating to such issue up to the present and the future."

Soon after the jury was given this response, counsel for the Santillans asked to clarify the response to ensure that the jury understood it was free to consider evidence that the Diocese had a long-standing pattern and practice of ignoring reports of sexual misconduct by its priests that predated and postdated the abuse of the Santillans: "For the statute of limitations and negligence issues, you are entitled to consider evidence to the present regarding the patterns or practices of the Defendant."

The Diocese objected that the proposed instruction was argumentative because it unduly emphasized the Santillans' argument on the issue. The trial court agreed, stating that it believed the answer already given was accurate. George contends on appeal that the trial court erred by refusing to give the clarification he requested because it precluded the jury from using evidence of the Diocese's pattern and practice of ignoring or concealing reports of priest sexual misconduct to infer that the Diocese had notice of such conduct by Herdegen for purposes of the statute of limitations.

We agree the trial court reasonably could have concluded that the requested clarification was argumentative. This is especially so since the instruction was offered after the court had already given the four-part answer to the jury's earlier question and after the jury had recommenced deliberation. Instructions are to state rules of law in general terms and avoid reciting matters of evidence. Instructions that unduly emphasize issues or theories, either by singling them out or making them unduly prominent, are improper. (*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1108 [16

Cal.Rptr.3d 521].) The clarification that George requested arguably violated this rule because, standing alone, it would have highlighted one aspect of his evidentiary theory concerning notice, as opposed to the general answer that was given with his counsel's agreement.[10]

### 3. *Excluding Certain Impeachment Evidence Against Mahony*

The trial court granted a pretrial motion by the Diocese to preclude the Santillans from introducing evidence of certain inconsistent statements by Mahony made in other proceedings concerning his ability to recall whether he had heard reports that priests other than Herdegen were molesting children. The evidence was relevant, the Santillans contended, in order to impeach Mahony's credibility for either truthfulness or accurate recollection. The trial court granted the motion on three grounds: (1) the proposed evidence was weak; (2) it related to collateral matters that were not relevant to this action; and (3) the evidence was more prejudicial than probative under Evidence Code section 352 because it was highly sensational and would consume substantial time at trial.

George contends the trial court erred by excluding the evidence, which consisted of the following: (1) at a 1998 trial for sex abuse by a priest in the Stockton Diocese, Mahony testified that while he was the Bishop of the Stockton Diocese he knew of no priests in that diocese accused of sexual misconduct with minors, but in another trial in 2004, he testified that he received complaints about three priests while serving in the Stockton Diocese, with the first complaint coming in 1981; (2) during a 2004 deposition in another case, Mahony testified he did not recall a certain priest, but several exhibits showed that in the 1960's, Mahony was involved in correspondence concerning that priest's need for drug abuse treatment; and (3) a memo prepared by Mahony for litigation of these coordinated proceedings states that a videotape found in another priest's room showed improper, but not sexual, behavior with high school boys, but the priest's personnel file includes a report by Mahony to the Vatican stating that the priest had in fact engaged in sexual conduct.

As to the first, the trial court found it was not strong impeachment because Mahony was heavily involved in litigation related to sex abuse by priests and it was not surprising that his recollection may have been refreshed. As to the second, the exhibits were unclear as to whether any sexual problems were at issue, and Mahony's failure to recall the priest 40 years later was not surprising and therefore was not strong impeachment evidence. As to the third, there was no showing as to when the documents were prepared, the

---

[10] At Howard's retrial, the court is free to reconsider the proposed instruction.

sources of information used to prepare them, or the extent to which Mahony was actually involved in their preparation. As a result, the documents did not show whether they represented impeachment of Mahony.

■ Evidence Code section 352 grants the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate the undue consumption of time, or create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. George bears the burden on appeal of establishing an abuse of discretion. (*Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307 [41 Cal.Rptr.3d 80].) He has failed to do so.

In his opening appellate brief, George's arguments on this issue were limited to the general notion that the evidence was relevant, and that the trial court abused its discretion because the impeachment evidence was required to overcome Mahony's inherent believability due to his status as a cardinal of the Catholic Church. His reply brief tried to amplify the importance of the evidence, and also argued for the first time that it would not have taken too much time because any rebuttal evidence to support Mahony's character for truthfulness would necessarily be limited to his truthfulness in regard to reports of abuse by priests.

At no point does George discuss the trial court's finding that the proposed evidence was unduly prejudicial, and that its prejudice outweighed any probative value. We therefore deem the issue waived. (*Dominguez v. Washington Mutual Bank* (2008) 168 Cal.App.4th 714, 727 [85 Cal.Rptr.3d 705] (*Dominguez*).) Nor does he cite authority for the proposition that any rebuttal evidence by the Diocese concerning Mahony's reputation for truthfulness would have to be limited to the area of his knowledge of reports that priests were abusing children. (See Evid. Code, § 790 [evidence of a witness's good character is admissible to support his credibility if evidence of his bad character was admitted to attack his credibility].) We therefore deem that issue waived as well. (*Dominguez, supra,* at p. 727.)[11]

## 4. *The Order Granting Howard a New Trial Was Proper*

### A. *Standard of Review*

■ The trial court may grant a new trial based on newly discovered evidence if the moving party shows the evidence is newly discovered, reasonable diligence was used to find it, and the new evidence is material to

---

[11] Because we have not reached the merits of the trial court's ruling, the trial court is free to reconsider the admissibility of the impeachment evidence during Howard's retrial.

the moving party's case. (§ 657, subd. 4; *Wood v. Jamison* (2008) 167 Cal.App.4th 156, 161 [83 Cal.Rptr.3d 877].) Evidence is material when it is likely to produce a different result. (*Wood*, at p. 161.)

The trial court has wide discretion in granting a new trial motion that will not be disturbed unless an abuse of discretion is clearly shown. Every presumption is indulged in favor of the trial court's order, and the court's finding that the new evidence would make a different result probable is entitled to great weight. (*Teixeira v. Domingos* (1957) 151 Cal.App.2d 380, 384 [311 P.2d 634].) The trial court determines what evidence to believe, and the evidence submitted by the prevailing party, along with its reasonable inferences, is deemed established. (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159–160 [72 Cal.Rptr.3d 369].) We will affirm an order granting a new trial so long as there is a "reasonable or even fairly debatable justification under the law" to support it. (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122 [105 Cal.Rptr.3d 485].)

### B. *Diligence in Alerting the Court to the New Evidence*

The Diocese contends Howard did not act with sufficient diligence in alerting the trial court to his new evidence because he learned about it on the first day of jury deliberations, but instead of immediately bringing a motion to reopen the evidence, he waited until after the jury returned its unfavorable verdict to seek a new trial. The Diocese cites several decisions that it believes support this contention. (*Baron v. Sanger Motor Sales* (1967) 249 Cal.App.2d 846, 860–861 [57 Cal.Rptr. 896] [in order to rely on newly discovered evidence as grounds for a new trial motion, the party must have made the new evidence known to the court at the earliest possible moment and cannot speculate on a favorable verdict]; *Stoumen v. Munro* (1963) 219 Cal.App.2d 302, 319 [33 Cal.Rptr. 305] [trial not complete until findings are signed and filed]; *Hayutin v. Weintraub* (1962) 207 Cal.App.2d 497, 512 [24 Cal.Rptr. 761] [for new trial motion, evidence must be newly discovered after the trial or too late to produce at trial]; *Celli v. French* (1951) 107 Cal.App.2d 599, 602–603 [237 P.2d 536] [party with newly discovered evidence was entitled to new trial where he made timely motion to reopen the case that was denied].)

The problem with these decisions is that they either involve bench trials, or jury trials where the new evidence was discovered before the case was submitted to the jury. (*Hayutin v. Weintraub, supra,* 207 Cal.App.2d 497 [bench trial]; *Stoumen v. Munro, supra,* 219 Cal.App.2d 302 [bench trial]; *Celli v. French, supra,* 107 Cal.App.2d 599 [jury trial where evidence was discovered after the taking of evidence was completed but motion to reopen

was made and denied on the date jury *was to begin* its deliberations]; *Baron v. Sanger Motor Sales, supra*, 249 Cal.App.2d 846 [new evidence discovered while evidence was still being taken and no motion to continue was made before the close of evidence].) The same is true of the Diocese's reliance on decisions concerning new trial motions made on grounds other than that of newly discovered evidence. (*Kauffman v. De Mutiis* (1948) 31 Cal.2d 429, 431, 433 [189 P.2d 271] (*Kauffman*) [order granting motion for new trial on ground of surprise reversed where party learned a material witness would be absent before putting on his rebuttal case, but declined to seek continuance, stating that if " 'anything went wrong he would file . . . a motion for . . . new trial' "]; *Sherman v. Southern Pacific Co.* (1914) 168 Cal. 722, 726 [145 P. 92] [order granting motion for new trial on ground of juror misconduct reversed where moving papers only showed that the misconduct was discovered after the jury was impaneled, but did not address whether the misconduct was learned only after the trial and before the verdict].)[12]

As far as we can tell, no reported decisions have directly addressed the issue whether a motion for new trial based on newly discovered evidence should be denied where the moving party discovered the evidence during jury deliberations and did not bring a motion to reopen the case at that time.[13] However, *Kauffman, supra*, 31 Cal.2d 429, which was cited by the Diocese, points us to an earlier Supreme Court decision that supports the order granting Howard a new trial.

The *Kauffman* court distinguished its facts from those in *Delmas v. Martin* (1870) 39 Cal. 555 (*Delmas*), where the defendant in a quiet title action moved for a new trial on the ground of surprise when the plaintiff produced a never-before-disclosed unrecorded deed to support his ownership claim. The *Delmas* court reversed the trial court's order denying the defendant's new trial motion, even though the defendant did not move for a continuance after the surprise deed was put in evidence.

---

[12] The Diocese also cites *McGuire v. W. A. Thompson Distrib. Co.* (1963) 215 Cal.App.2d 356 [30 Cal.Rptr. 113] (new trial motion properly denied by trial court on ground of court's error in responding to a jury question when the moving party did not object at the time the answer was made, but instead waited until after a verdict was reached). Although that case involved the failure to address something that occurred while the jury deliberated, because the error at issue could have occurred only during deliberations, the decision is not analogous.

[13] One decision came close. The court in *Fitzgerald v. Fishburn* (1963) 219 Cal.App.2d 152 [33 Cal.Rptr. 148] affirmed an order granting a new trial motion based on evidence that the opposing party contended was discovered during jury deliberations. The Court of Appeal construed the parties' declarations differently and concluded that they could be read to state that the evidence was not discovered until after the verdict. As a result, the *Fitzgerald* court declined to reach the issue whether a motion to reopen the evidence was required when new evidence was discovered while the jury deliberated. The court also noted that it had found no California authority to support the appellant's contention that a motion to reopen was required when new evidence was discovered while the jury was still deliberating. (*Id.* at p. 156.)

The *Delmas* court first noted the general rule, which requires a party who is surprised by evidence at trial to apply for relief as soon as possible, instead of speculating on the chances of a favorable verdict and then moving for a new trial if he loses. However, that general rule can be relaxed in certain cases and a new trial motion may be granted, the *Delmas* court held. That should happen only where the surprise is clearly established and its consequences can be avoided at a new trial, and where the moving party is not guilty of laches and acted in good faith in failing to seek relief earlier. (*Delmas, supra,* 39 Cal. at pp. 557–558.) This was such a case, the *Delmas* court held, because the surprise deed "was the last evidence offered in the cause, and the Court immediately proceeded to charge the jury. It may well be, that in the last stage of a jury trial, at the conclusion of the evidence, sufficient opportunity may not have occurred to enable the defendants and their counsel to decide, deliberately and discreetly, what course it was proper to pursue in respect to the last item of proof which was offered in the cause." (*Id.* at p. 558.)

Although the *Delmas* rule was later confined to its factual setting (*Ferrer v. Home Mutual Ins. Co.* (1874) 47 Cal. 416, 430), the facts of this case, viewed in the light most favorable to the trial court's order, are more compelling. While the surprise evidence in *Delmas* was introduced as the last piece of evidence, the trial court proceeded to immediately instruct the jury, giving the defendant insufficient time to react. Here, the new evidence was discovered not just at the close of taking evidence, but after the parties had rested and while the jury was deliberating. At the hearing on the motion, the trial court suggested that it would have likely denied a motion for a continuance. In its ruling, the trial court found that the new trial motion was proper both because Wright was not available as a witness because he lived in Arizona and could not be subpoenaed, and because his status as a material witness "was discovered so late."

Given this unique set of facts, combined with the absence of any onpoint case authority to guide Howard's counsel when Wright contacted him, we conclude that the trial court stayed within its broad range of discretion in determining that Howard's new trial motion was timely.[14]

### C. *Diligence in Conducting Discovery*

A party moving for a new trial on the ground of newly discovered evidence must show that he could not, with reasonable diligence, have discovered or

---

[14] The Diocese contends Howard's motion was defective because his lawyer did not provide an explanation for his failure to seek a continuance and reopen the case after hearing from Wright. Although the declaration does not expressly address that point, it is at least implicit in the explanations offered by Wright and counsel in their declarations, which detail the circumstances under which Wright first contacted the lawyer.

produced the evidence at the trial. (§ 657, subd. 4; *Singh v. Frye* (1960) 177 Cal.App.2d 590, 594 [2 Cal.Rptr. 372].) Whether or not a reasonable effort was made to discover the evidence is an issue best left to the trial court, and we will not disturb its findings without a clear showing that the court abused its discretion. (*Singh,* at p. 594.) The Diocese contends Howard did not exercise reasonable diligence in discovering Wright's evidence because Wright's name was on a roster of parish school students that was produced during discovery. We disagree.

Anthony De Marco, one of the Santillans' lawyers, submitted a declaration laying out the discovery efforts that were made to learn the identities of anyone who had either been one of Herdegen's victims, or who had reported Herdegen's conduct to the Diocese. De Marco said he and his investigator interviewed or deposed more than 100 people from Wasco or other communities where Herdegen had served. They tried but failed to reach 50 other people. These were people who they suspected might have been abused or had spent time with Herdegen. Questions were asked concerning not just family members, but anyone else the potential witnesses might know or have heard about who were aware of sexual misconduct by Herdegen. Not one ever mentioned Wright as a possible victim or as someone who had complained about Herdegen, either during these interviews or at depositions. Excerpts from Herdegen's deposition transcript were provided where Herdegen denied that anyone ever made a complaint to the Diocese about his molestations.

The trial court found these efforts constituted reasonable diligence and, under the applicable standard of review, we cannot disagree. We therefore conclude that reasonable diligence was shown. (See *Celli v. French, supra,* 107 Cal.App.2d at pp. 602–603 [new trial for plaintiffs affirmed when eyewitness to accident was discovered right after close of evidence, and plaintiffs had canvassed the neighborhood where accident occurred looking for witnesses, and had twice knocked on the door where the new witness lived, but got no response].)

D.   *The New Evidence Is Material*

The Diocese contends Wright's testimony would not be material because neither the evidence at trial, nor the evidence raised as part of the new trial motion, show that the parish school principal to whom Wright made his complaint was an employee of, or had a duty to report to, the Diocese about this matter. We disagree.

In opposition to the new trial motion, the Diocese offered in evidence the articles of incorporation for the education corporation that built the school in

order to show that the school was an entirely separate corporate entity. However, those articles state that the education corporation was formed to "acquire, establish, construct, maintain, *conduct and operate* [various Catholic schools] *under the supervision, management and control*" of the Diocese's bishop. The articles also provided that whoever served as bishop would always be both a director on the board and president of the education corporation.

In addition, Mahony testified that the Diocese was in charge of and operated the school, that the bishop appointed the superintendent of the parish schools and delegated to that person supervision of the schools, and that in the 1960's a priest of the Diocese who suspected another priest of child molestation was required to report those suspicions to his superiors within the Diocese, but that the same was not necessarily true for lay employees. If a priest of the Diocese had a duty to report, then it is inferable that a nun of the Diocese would have the same duty. This seems especially likely for a nun who is also the principal of a school that is under the supervision, management, and control of the bishop, who is not just the sole shareholder of the Diocese, but is also the president and a director of the education corporation that directly operates the school. The trial court implicitly found this evidence credible enough for a new jury to consider at a new trial, and we see no abuse of discretion in that finding.

### E.   *Other Points Raised by the Diocese*

The Diocese raises three other issues in an attempt to have us reverse the new trial order for Howard: (1) allowing the jury to hear Wright's testimony would violate its constitutional due process rights; (2) the trial court should not have considered Wright's declaration because the Santillans' lawyer would not allow the Diocese to interview Wright or take a statement from him; and (3) if we affirm the new trial order, on remand the trial should be limited to Wright's evidence only. We reject all three.

First, the Diocese asserts a due process violation without citation to authority or any real analysis. That issue is therefore waived. (*Dominguez, supra,* 168 Cal.App.4th at p. 727.) The same is true for the second issue concerning access to Wright, who we presume will be available for deposition upon remand (*Beverly Hospital v. Superior Court* (1993) 19 Cal.App.4th 1289, 1295 [24 Cal.Rptr.2d 238] [additional discovery is allowed when a new trial is granted]), and for the third issue concerning a retrial limited solely to Wright's testimony.

## 5. *The Order Denying George a New Trial for Newly Discovered Evidence Was Proper*

George contends the trial court erred by denying the new trial motion as to him, because the newly discovered evidence from Wright that he reported Herdegen's sexual misconduct in 1967 created an inference that the Diocese knew about Herdegen's conduct earlier, during the time when he was still molesting George.

As with orders granting a new trial, we review an order denying a new trial motion under the abuse of discretion standard. However, in doing so, we must review the entire record to determine independently whether there were grounds for granting the motion. (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832 [30 Cal.Rptr.3d 588].)

Section 340.1, subdivision (b)(2) applies when an entity defendant knew or had reason to know of its agent's unlawful sexual conduct and failed to take steps to avoid such acts *"in the future* by that person." (Italics added.) The plaintiffs in *Doe, supra,* 42 Cal.4th 531, were unable to state a cause of action that qualified for the 2003 revival window because they failed to allege that the defendants knew or had reason to know that the perpetrator "had engaged in *past* unlawful sexual conduct . . . ." (*Id.* at p. 546, italics added.) Thus, construing the subdivision as a whole, the notice requirement refers to knowledge or notice of *past* unlawful sexual conduct by the individual currently accused of other unlawful sexual conduct. (*Id.* at p. 549.) This was echoed by the court in *Deutsch v. Masonic Homes of California, Inc., supra,* 164 Cal.App.4th at page 775, which stated that "[u]nder *Doe,* notice is measured by the facts known to the defendant—either knowledge of the fact that *prior unlawful conduct* had occurred, or knowledge of facts from which such *prior unlawful conduct* should be inferred—not by facts which the defendant should have discovered or should have noticed." (Italics added.)

██ In short, notice comes from knowledge of unlawful sexual conduct by the perpetrator either before the plaintiff was molested, or after the molestation began. Implicit in that notion is the corollary principle that knowledge of facts concerning an agent's unlawful sexual conduct after he has stopped abusing a plaintiff does not amount to notice under section 340.1.

Evidence that Wright told his parish school principal about what happened to him in 1967 came at least a year after Herdegen stopped molesting George. The inference George asks us to draw from that evidence—that someone else might have notified the Diocese sooner—is not just speculative. It is also contrary to the express terms of section 340.1, subdivision (b) and the language of *Doe, supra,* 42 Cal.4th at pages 546, 549. Because the new

evidence does not show that the Diocese was on notice early enough to save George's claims under the statute of limitations, the trial court did not err in denying his new trial motion.

## DISPOSITION

The order denying George Santillan's motion for a new trial, and the judgment for the Diocese against George, are both affirmed. The order granting Howard Santillan a new trial is affirmed and this matter is remanded to the trial court for that purpose. The Diocese shall recover from George Santillan its appellate costs attributable to him, and Howard Santillan shall recover his appellate costs from the Diocese.

Flier, J., and Grimes, J., concurred.

On February 1, 2012, the opinion was modified to read as printed above.