Filed 10/13/22  P. v. Bunn CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>CLIFFORD LAMONT BUNN,<br><br>    Defendant and Appellant. | A165857<br><br><br><br>(Kern County<br>Super. Ct. No. MF013335A) |

This is an appeal from judgment after a jury convicted defendant Clifford Bunn of seven felony rape and other sexual assault crimes against Angelle C., his stepdaughter, a child under age 11.[1]  Defendant received a total sentence of 145 years to life in prison.  On appeal, defendant contends the trial court prejudicially erred by excluding evidence relating to the alleged infidelity of Ruby B., his former wife and Angelle's mother, and Angelle's alleged behavioral issues at school.  Defendant also contends the trial court abused its discretion by imposing consecutive sentences on all seven counts, rather than concurrent sentences.  We reject these contentions and affirm.

---

[1] This matter was transferred by California Supreme Court order on August 9, 2022, from the Fifth Appellate District to the First Appellate District.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 13, 2020, an amended information was filed charging defendant with four counts of sexual intercourse or sodomy with a child under age 11 (Pen. Code, § 288.7, subd. (a); counts 1, 3, 5, and 7),[2] and three counts of oral copulation or sexual penetration with a child under age 11 (§ 288.7, subd. (b); counts 2, 4, and 6).

Trial began January 13, 2020, and revealed the following.

### I. *The Prosecution's Case.*

Defendant and Ruby were married and had lived together since 2017. Ruby had a daughter from a previous relationship, Angelle, born in 2009, who had lived with the couple since 2018. Defendant and Ruby's marriage was marred by tension. Ruby became suspicious of defendant after once finding an opened condom and, another time, finding what appeared to be a second cell phone. Defendant denied being unfaithful or having another phone.

### A. Discovery of Defendant's Sexual Abuse.

On March 4, 2019, Ruby left for the morning, leaving Angelle, age 10, with defendant, age 49 or 50. However, Ruby returned home unexpectedly, after discovering she left behind some needed items. Ruby was surprised to find her bedroom door locked. Ruby pounded on the door, hearing shuffling inside the bedroom. Finally, defendant, naked, unlocked the door before running back across the bedroom, throwing something in the trash can, and jumping into bed. Ruby went to the trash can and found a blue ring with a condom wrapped around it.

---

[2] Unless otherwise stated, all statutory citations herein are to the Penal Code.

Ruby then went to the bathroom door, which was closed. After opening the door, Ruby saw her daughter, Angelle, sitting on the toilet. As Ruby approached, Angelle quickly flushed but not before Ruby saw blood in the water. Extremely upset, Ruby grabbed a knife from the kitchen and cut defendant's arm. She then called 911.

## B. The Investigation and Angelle's Statements.

Officer Brian Hansen, trained in responding to sexual assaults, responded to Ruby's 911 call. When Officer Hansen first arrived, Ruby told him that she caught her husband " 'having sex' " with her daughter and gave him the condom and blue ring that she found in the trash. The condom, which had a red substance on it, was booked into evidence. Defendant was arrested and received medical treatment for the cut on his arm before being booked into jail.

Angelle was taken to a hospital for a sexual assault exam. Angelle told the examining nurse that her "dad" had been "having sex" with her for about a year. She further stated that he would kiss her all over and that she would orally copulate him. Angelle also said that she had some bleeding that day but that she did not always bleed during intercourse. Consistent with her statements, the nurse found abrasions, lesions and tenderness consistent with penile penetration and sexual assault. The nurse took several swabs and collected Angelle's underwear for testing.

Officer Hansen interviewed Angelle later that day. Angelle told him that defendant, wearing a condom, was having sex with her that morning when Ruby came home and started banging on their bedroom door. Angelle explained she and defendant had been engaging in sexual intercourse several times a week since March 2018, about 100 times in total, and that she orally copulated him each time. Mostly, this occurred in defendant and Ruby's bed.

3

Once, they had sexual intercourse while her sister and Ruby were also in bed. The family had been watching a movie together in the bed, and Ruby and Angelle's sister fell asleep. Angelle did not tell anyone about defendant's abuse because she loved him and did not want him to get in trouble. Angelle also told Officer Hansen that Ruby and defendant had been arguing that morning before Ruby discovered them together. When Ruby confronted her, Angelle first denied having sex with defendant, prompting Ruby to repeatedly hit her.

A few days later, Angelle was interviewed at a child assessment center. Again, Angelle described having sexual intercourse with defendant regularly since March 2018. Angelle further stated that defendant went to jail for "having sex" with her after Ruby caught them. On that particular morning, she was getting ready for school when defendant went to get a condom and to check to make sure Ruby had left. When Ruby unexpectedly knocked on the bedroom door, defendant told Angelle to go to the bathroom.

Angelle further stated that the day before they were caught, defendant told Angelle to "suck on [his penis]" (which she did) while they were in his truck driving home. They had sex in defendant's truck many times and sometimes had to stop when Ruby called defendant on his cell phone. Generally, defendant would tell Angelle to " '[g]et ready,' " which meant he wanted to have sexual intercourse. Once, they had sexual intercourse in defendant and Ruby's bed while her sister and Ruby were also in the bed, sleeping. Angelle also specifically remembered having sexual intercourse with him in February 2019, two days before her birthday.

Angelle described defendant as her friend and said she did not want him to go to jail. Defendant told her not to tell anyone about their sexual relationship. Angelle also had sexual intercourse twice with "Phillip" in

4

Las Vegas when she lived with her biological father before moving in with defendant and Ruby. Angelle was able to mark on a drawing where a female's vagina and a male's penis are located.

Angelle's trial testimony was generally consistent with her previous statements, although she initially denied remembering anything about the day that defendant's crimes came to light, or knowing what " 'sex' " is. Angelle testified that she and defendant had sexual intercourse regularly for about a year, from March 2018 to his arrest in March 2019. Usually, they had sexual intercourse in defendant's bed or his truck, including the day before Ruby discovered them together. Defendant forced Angelle to orally copulate him every time they had sexual intercourse. They also had sexual intercourse once while Ruby and Angelle's sister were also in bed. Angelle did not report defendant's abuse because she did not want defendant to get into trouble. Before Angelle moved in with defendant and Ruby, "Uncle Phil" had sexual intercourse with her at her biological father's house in Las Vegas.

**C.     DNA Evidence.**

The swabs from Angelle's sexual assault evidence kit and the condom from the trash can were tested. A mouth (buccal) swab from defendant was also tested, sealed and booked into evidence. The red substance on the condom tested positive for blood.

The buccal swabs from defendant and Angelle were used as known reference samples for the DNA testing of the condom and Angelle's sexual assault kit. Angelle could not be excluded as a potential contributor for the red substance on the condom, whereas defendant could be excluded. As to the swabs from the sexual assault kit, neither defendant nor Angelle could be excluded as potential contributors.

## II.   *Defense Case.*

Several friends and relatives testified that the crimes alleged against defendant were inconsistent with his character.

Defendant's mother, Barbara B., lived with Angelle, Ruby, and defendant. Defendant had been around children his whole adult life, and Barbara never saw defendant behave inappropriately with Angelle or any other child. If she had, Barbara would have reported it. Barbara did not believe the charged allegations were consistent with her son's character. After defendant's arrest, she allowed Ruby and Angelle to continue living at the home because they had nowhere else to go.

Defendant's sister also lived with defendant, Ruby, Angelle and Barbara, for about a year and a half, and never saw defendant act inappropriately or suspiciously. She did not believe defendant would have committed the charged offenses.

Marva B. had known defendant since 2016. She had seen defendant around children in the past and never saw him behave inappropriately. In her opinion, the charged allegations were inconsistent with defendant's character. Marva further testified that defendant and Ruby frequently argued. She had seen defendant attempt to ignore Ruby's phone calls. However, Ruby would keep calling him until he answered.

Deshawnia P. had known defendant for about 20 years. Deshawnia had seen defendant interact with children before, including her own, and never saw him act inappropriately. Deshawnia also testified that the charged allegations were not consistent with defendant's character.

Anthony R., a close friend of defendant since 2012, had also seen defendant interact with children before, including his own. Anthony was

6

certain defendant would not commit the charged acts, and he questioned whether the DNA evidence was accurate.

### III. *The Verdict, Sentencing, and Appeal.*

On February 4, 2020, the jury found defendant guilty as charged. The trial court sentenced him to a total term of 145 years to life, consisting of consecutive 25 years to life sentences on the sexual intercourse or sodomy counts and consecutive 15 years to life sentences on the oral copulation or sexual penetration counts.

On June 12, 2020, defendant filed a timely notice of appeal.

## DISCUSSION

Defendant raises three primary grounds for reversal: The trial court prejudicially erred by excluding evidence relating to (1) Ruby's alleged infidelity and (2) Angelle's alleged behavioral issues at school and (3) abused its discretion by imposing consecutive rather than concurrent sentences. We address each one in turn.

### I. *The trial court's evidentiary rulings stand.*

#### A. **Evidence of Ruby's Infidelity.**

Defendant contends his state and federal constitutional rights to due process, confronting adverse witnesses and presenting a defense were violated when the trial court barred him from cross-examining Ruby about posting on social media regarding her new boyfriend and changing her profile status to "new relationship" just after his arrest, and from questioning defense witness Anthony about Ruby's social media activity and witnessing her having sex with another man in November 2017 while still married to defendant. Defendant claims this evidence was admissible to prove Ruby's bias and motive to lie and to coach Angelle to lie about his sexual abuse. Moreover, he claims this evidence was vital to his defense given that Ruby

7

reported his crimes and turned over key DNA evidence (the condom and blue ring) to the police. (See Evid. Code, § 785 ["The credibility of a witness may be attacked or supported by any party"]; *People v. Pearson* (2013) 56 Cal.4th 393, 433–434 [a party may ask questions of a witness on cross-examination for the purpose of attacking the witness's credibility as long as the questioner has a good faith basis for asking the question].) The following legal framework applies.

"All relevant evidence is admissible, but only relevant evidence is admissible. (Evid. Code, §§ 350, 351.)" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095 (*McCurdy*).) Under Evidence Code section 352, the court has broad discretion to determine relevant evidence should nonetheless be excluded because its probative value is substantially outweighed by its prejudicial effect. (*People v. Champion* (1995) 9 Cal.4th 879, 922; Evid. Code, § 352.) " 'Prejudice,' as used in Evidence Code section 352, is not synonymous with 'damaging.' [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against [a victim, witness or party], and has little to do with the legal issues raised in the trial." (*McCurdy*, at p. 1095.)

On appeal, a trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice." (*People v. Avitia, supra*, at p. 193; see *People v. Dyer* (1988) 45 Cal.3d 26, 73.)

Here, the trial court excluded this proffered evidence under Evidence Code section 352 on the grounds that it was confusing, irrelevant and, as to the alleged 2017 infidelity, too remote in time to be probative. We find

8

nothing arbitrary, capricious, or patently absurd about these rulings. (*People v. Avitia, supra*, 127 Cal.App.4th at p. 193.)

First, there was no evidence Ruby was romantically involved with the man identified on her social media page at the time defendant's crimes were committed, which renders defendant's proposed line of questioning speculative, irrelevant and confusing to the jury. Moreover, while defendant contends this information was vital to his theory that Ruby made up his crimes to get back at him, the trial court permitted him to present testimony from friends and family depicting Ruby as jealous and their marriage as troubled. Ruby herself testified that she had recently found an opened condom and what appeared to be a photograph of defendant with a second cell phone. As such, this theory was before the jury notwithstanding the court's evidentiary ruling.

Further, as to Ruby's alleged infidelity in 2017, we agree with the trial court that admission of this evidence, given its remoteness in time, would be significantly more prejudicial and confusing than probative of Ruby's bias or motive to lie. Angelle consistently testified defendant's sexual abuse did not begin until March 2018. Further, Ruby did not discover and report his abuse until March 2019, two years after the alleged infidelity. As such, the evidence would do little more than "evoke an emotional bias" against Ruby despite having "little to do with the legal issues raised in the trial." (*McCurdy, supra*, 59 Cal.4th at p. 1095.)

We also reject defendant's argument that exclusion of this evidence implicated his constitutional rights to due process and a fair trial. " 'Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor [citations], " . . . the proffered evidence must have more than 'slight-

9

relevancy' to the issues presented." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 865.) Thus, while defendant may be correct Ruby's bias was of vital importance to his case, "this does not mean the trial court constitutionally was compelled to permit [him] to introduce all possibly relevant evidence on these subjects despite its marginal relevance, the possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions), and the potentially significant amount of time entailed in admitting the evidence in a manner fair to both sides. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 82 [citations] ['a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon' the constitutional right to offer a defense]; [citations].)" (*People v. Fuiava* (2012) 53 Cal.4th 622, 665–666.) As mentioned, the trial court admitted testimony from defendant's friends and family regarding Ruby's jealousy and the troubled state of their marriage. Evidence was also presented that Ruby was so enraged that she repeatedly hit Angelle after the child initially denied having sex with defendant and that she then stabbed defendant before calling 911. All of this evidence was helpful to defendant's theory that Ruby was motivated to lie and to coach Angelle to lie about his abuse. Under these circumstances, the court did not abuse its discretion in refusing to admit further evidence of Ruby's 2017 infidelity notwithstanding its slight relevance.

Finally, even assuming for the sake of argument this evidence should have been admitted, given its minimal relevance, it is not reasonably likely admitting it would have led to a different verdict. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611–612 [exclusion of evidence, even if erroneous, is harmless if it does not appear reasonably probable the verdict was affected].) The

10

evidence of defendant's guilt was overwhelming. Angelle consistently described his crimes to multiple people, from the time the police were first summoned until the trial was complete. Moreover, both medical and DNA evidence supported her descriptions. Under these circumstances, the court's rulings provide no grounds for reversal.

### B. Evidence of Angelle's Behavioral Issues.

We apply this same reasoning to reject defendant's contention that the trial court prejudicially erred by excluding evidence relating to Angelle's behavioral issues at school. Specifically, defense counsel requested to question Angelle or Ruby about information counsel received about Angelle's having been in trouble at school for "issues of misconduct, fighting with other people, and potentially not being completely honest." The trial court denied this request on grounds of irrelevance, improper character evidence and lack of foundation. As before, defendant claims the court's ruling was prejudicial error because the excluded evidence was vital to his defense in that it tended to impeach his accuser Angelle's credibility. We disagree.

Putting aside the fact that the record contains no offer of proof as to any specific incident of Angelle's alleged behavioral issues, which itself is grounds for rejecting defendant's challenge (*People v. Foss* (2007) 155 Cal.App.4th 113, 127), we, as did the trial court, question the excluded evidence's relevance. "The law no longer recognizes a distrust of the testimony of someone based on having been a victim of unwanted sexual advances." (*People v. Foss, supra*, at p. 130.) The trial court could have reasonably determined Angelle's behavior at school was too tangential and unrelated to the charged crimes to warrant questioning.

Defendant responds that said evidence would have added to the reasons to be skeptical of Angelle's truthfulness given that she made some

inconsistent statements regarding the number of times the abuse occurred, initially testified she did not remember the March 4, 2019 incident and denied knowing what sex is. Perhaps. But the issue for purposes of Evidence Code section 352 is whether the prejudicial value of the evidence substantially outweighs its probativeness. Here, the trial court reasonably found this weak evidence was likely to evoke an emotional bias against Angelle despite being minimally probative on the issues at hand, such as whether she credibly reported defendant's crimes after Ruby found defendant naked with an opened condom in a just-unlocked bedroom with Angelle hiding in the bathroom. Under these circumstances, defendant failed his burden to prove the court's ruling was an abuse of discretion. (*McCurdy, supra*, 59 Cal.4th at p. 1095; see *Santillon v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 727.)

Finally, given the appropriateness of the trial court's refusal to allow questioning on the issue of Angelle's school behavior, there was no violation of defendant's federal constitutional rights. As stated *ante*, generally, a court's application of ordinary rules of evidence does not impermissibly infringe on a defendant's fundamental right to present a defense. (*People v. Fuiava, supra*, 53 Cal.4th at pp. 665–666.)

### C.    No Cumulative Error.

Relatedly, defendant contends the cumulative effect of the claimed errors in excluding his proffered evidence was prejudicial, warranting reversal. Under the "cumulative error" doctrine, we reverse a judgment if there is a " 'reasonable probability' " that the jury would have reached a result more favorable to defendant absent a combination of errors. (E.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 771, 772, fn. 32.) Here, however, as discussed *ante*, the court's

12

exclusion of his proffered evidence was not error, much less prejudicial error. And, in any event, even assuming for the sake of argument that defendant's trial was less than perfect, there is no basis for concluding he did not receive due process and a fair trial. (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 ["The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial' "].)

## II.   *No Sentencing Error.*

Lastly, defendant contends the court abused its discretion by imposing consecutive life sentences on all seven counts rather than concurrent life sentences. He is wrong.

When a defendant has been convicted of two or more offenses, including offenses punishable by indeterminate life sentences,[3] the sentencing court generally has discretion to impose the sentences consecutively or concurrently. (§ 669; *People v. Woodworth* (2016) 245 Cal.App.4th 1473, 1479 [" 'Absent an express statutory provision to the contrary, section 669 provides that a trial court shall impose either concurrent or consecutive terms for multiple convictions' "].)

On appeal, we review a trial court's discretionary sentencing decision for an abuse of discretion. (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 831.) As such, we will not reverse absent a clear showing of abuse. (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) A judgment is presumed correct on appeal, and it is the appellant's burden to prove the trial court committed error. (*People v. Booth* (2018) 25 Cal.App.5th 450, 452 (*Booth*).)

---

[3] A person found guilty under section 288.7, subdivision (a) "shall be punished by imprisonment in the state prison for a term of 25 years to life." (§ 288.7, subd. (a).) A person found guilty under section 288.7, subdivision (b) "shall be punished by imprisonment in the state prison for a term of 15 years to life." (§ 288.7, subd. (b).)

13

Here, the trial court's sentencing decision was consistent with the recommendation in the probation report calling for consecutive sentences rather than concurrent sentences on three grounds: (1) the crimes and their objectives were predominantly independent of each other; (2) the crimes were committed at different times or separate places; and (3) the crimes involved separate acts of violence or threats of violence. The prosecution also sought consecutive sentences for counts 1–7 in its sentencing brief, arguing: "It is the People's position that the Court does not have discretion in sentencing due to the nature of the acts, the multiple different acts and the sentencing scheme for each charge." Defendant, in his sentencing brief, argued for 25 years to life on count 1 with the remaining counts stayed or, alternatively, for concurrent sentences.

At the sentencing hearing, the prosecutor again argued for consecutive sentences, insisting that because defendant committed numerous separate offenses, "the Court does not have the authority to run all the counts concurrent." Defendant, in turn, requested clemency and objected to imposition of consecutive sentences. Following argument by counsel, the trial court observed that Angelle's trial testimony was "easily the worst testimony I've had to sit and listen to and to observe the effect on a young person at such a young age based on what happened." The court then confirmed it read and considered everything presented by the parties before indicating it would follow probation's recommendation. Accordingly, the court imposed consecutive sentences on all seven counts.

On appeal, defendant speculates the trial court was unaware of its discretion to impose concurrent terms, reasoning the court must have adopted the prosecution's mistaken position that consecutive sentences were mandatory. Defendant's mere speculation does not meet his burden to

14

affirmatively demonstrate error on appeal. (See *Booth, supra*, 25 Cal.App.5th at p. 452 [rejecting the contention that the court erroneously believed it had no discretion to run § 288.7 sentences concurrently].) Moreover, it runs counter to the well-established appellate rule that "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.)

We also note that, contrary to defendant's claim, the trial court had no obligation to "[make] clear [on the record] that it understood it had discretion to impose concurrent sentences." Under our statutory law, "a trial court is not required to state its reasons for ordering one indeterminate term to run consecutively to another indeterminate term. Section 1170, subdivision (c), which requires the trial court to 'state the reasons for its sentence choice on the record at the time of sentencing,' applies only to sentences imposed pursuant to section 1170, i.e., determinate sentences." (*People v. Arviso* (1988) 201 Cal.App.3d 1055, 1058; see Cal. Rules of Court, rules 4.403, 4.406(b)(5).)

Finally, defendant's case *People v. Billingsley* (2018) 22 Cal.App.5th 1076 is inapposite. *Billingsley* involved the retroactive application of an ameliorative change in the law that granted trial courts new discretion to strike firearm enhancements. At issue was whether, when the appellate court applied the new law retroactively, the record made it clear the trial court "would not have stricken the firearm enhancement . . . even if it had that discretion . . . ." (*Id.* at pp. 1080–1081.) It was under that very different circumstance that the appellate court held: " ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court." ' " (*Id.* at p. 1081.)

15

Here, there is no dispute on appeal the law at the time of sentencing afforded the trial court discretion to impose concurrent or consecutive sentences. Accordingly, for the reasons stated, we presume in the absence of contrary evidence that the trial court's sentencing order was a valid exercise of discretion.[4]

**DISPOSITION**

The judgment is affirmed.

_____
Jackson, P. J.

WE CONCUR:

_____
Simons, J.

_____
Wiseman, J.[*]

A165857/*People v. Clifford Lamont Bunn*

---

[4] Given this holding, we need not address defendant's ancillary claim that he received ineffective assistance based on his counsel's failure to object to the sentencing order. In any event, he appears mistaken. The record reflects that defense counsel raised an objection to the imposition of consecutive sentences at the hearing.

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.